UNITED STATES of America, Appellee,

v.

**Robert S. STOLLER, Defendant, Appellant.**

**No. 95–2175.**

United States Court of Appeals, First Circuit.

Heard Jan. 12, 1996.

Decided Feb. 29, 1996.

---

Anita S. Lichtblau, Trial Attorney, United States Dept. of Justice, Boston, MA, with whom Donald K. Stern, United States Attorney, Boston, MA, and Mark D. Seltzer, Director, New England Bank Fraud Task Force, Philadelphia, PA, were on brief, for U.S.

Before SELYA, Circuit Judge, ALDRICH and COFFIN, Senior Circuit Judges.

SELYA, Circuit Judge.

This appeal requires us to explore a shadowy corner of the Double Jeopardy Clause, dimly lit by a trilogy of recent Supreme Court cases. Concluding, as we do, that an administrative sanction imposed by the Federal Deposit Insurance Corporation (FDIC) does not comprise "punishment" within the purview of the Clause, we uphold the district court's denial of a motion to dismiss criminal charges later lodged against the same individual.

## I. BACKGROUND

Following chronological order, we recount the details of the administrative proceeding and then discuss the criminal case.

### A. *The Administrative Proceeding.*

From 1975 to 1990, defendant-appellant Robert S. Stoller toiled as the chief executive officer of the Coolidge Corner Cooperative Bank (the Bank). In 1986, the Bank became federally insured. Thereafter, Stoller caused it to make loans to several real estate trusts with which he was affiliated. The loans soured and the Bank sustained heavy losses.

In 1990, the FDIC instituted a debarment proceeding against Stoller. The FDIC charged, and an administrative law judge (ALJ) found, that the Bank underwrote the suspect loans without appropriate disclosure and in violation of Regulation O, 12 C.F.R. § 215 (a rule that caps the amount of credit a federally insured institution may extend to insiders and imposes lending limits on other extensions of credit). The ALJ concluded that Stoller's transgressions demonstrated a willful and persistent disregard for the Bank's soundness, and therefore warranted an order of proscription under 12 U.S.C.

John A. MacFadyen, Providence, RI, with whom Richard M. Egbert, Boston, MA, was on brief, for appellant.

§ 1818(e).[1] On administrative review, the FDIC's board of directors (the Board) affirmed the ALJ's factual determinations and approved his recommended order. Stoller requested reconsideration and clarification. On September 22, 1992, the Board issued a revised decision upholding the debarment order in slightly altered form: in its final version, the order prevents Stoller (who is an attorney) from serving as an officer or director of, exercising control over, or acting as counsel to, any federally insured financial institution.

### B. *The Criminal Case.*

In January 1995, a federal grand jury indicted Stoller for divers violations of federal banking laws, including nine counts of misapplying bank funds, *see* 18 U.S.C. § 656; thirty-one counts of unlawfully receiving loan-procurement commissions, *see id.* § 215; and eight counts of making false entries, *see id.* § 1005. Stoller promptly moved to dismiss the first nine counts of the indictment on double jeopardy grounds. The district court denied the motion, concluding that the debarment order did not constitute punishment in the relevant constitutional sense. *See United States v. Stoller,* 906 F.Supp. 39 (D.Mass. 1995). This appeal followed.

## II. APPELLATE JURISDICTION

■ As a general rule, federal appellate courts have jurisdiction only over final orders and judgments of district courts, and not over interlocutory decisions. *See* 28 U.S.C. § 1291. In *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), the Supreme Court carved an exception to this rule for pretrial refusals to dismiss criminal charges on double jeopardy grounds. Emphasizing that the Double Jeopardy Clause is a "guarantee against being twice put to trial for the same offense," *id.* at 661, 97 S.Ct. at 2041, the Court held that "pretrial orders rejecting claims of former jeopardy . . . constitute 'final decisions' and thus satisfy the jurisdictional prerequisites of § 1291," *id.* at 662, 97 S.Ct. at 2042.

■ It is possible to read too much into *Abney.* The Double Jeopardy Clause states that no person "shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const.amend. V. This protection is threefold: "it safeguards an individual against (1) a second prosecution for the same offense, following an acquittal; (2) a second prosecution for the same offense, following a conviction; and (3) multiple punishments for the same offense." *United States v. Rivera–Martinez,* 931 F.2d 148, 152 (1st Cir.), *cert. denied,* 502 U.S. 862, 112 S.Ct. 184, 116 L.Ed.2d 145 (1991). *Abney* spoke to a situation involving multiple prosecutions. Cases that involve multiple punishments arguably raise different jurisdictional concerns for appellate courts.

In *United States v. Ramirez–Burgos,* 44 F.3d 17 (1st Cir.1995), this court dismissed an interlocutory appeal stemming from the rejection of a multiple punishments claim asserted in connection with parallel counts contained in a single indictment. *See id.* at 18. We ruled that the defendant's right not to be punished twice could be vindicated adequately through a subsequent, end-of-case appeal, and distinguished those interlocutory double jeopardy appeals (like *Abney* ) that demand final resolution prior to trial because the defendant advances a claim alleging impermissible multiple prosecutions. *See id.* at 18–19.

Stoller's case falls somewhere between *Abney* and *Ramirez–Burgos.* Unlike in *Abney,* his double jeopardy claim rests on the prospect of multiple punishments rather than the fear of multiple prosecutions. Unlike in *Ramirez–Burgos,* however, the alleged multiple punishments arise in the course of two separate and successive proceedings rather than within a single proceeding. To complicate matters further, the fate of *Ramirez–Burgos* is uncertain in light of the Supreme Court's recent decision in *Witte v. United States,* —— U.S. ——, 115 S.Ct. 2199, 132 L.Ed.2d 351

---

1. This statute and the criminal statutes underpinning the later indictment are reprinted in the appendix.

(1995).[2] Although *Witte* and *Ramirez–Burgos* can perhaps be reconciled, the most obvious basis for harmonizing them—the number of proceedings involved—would, if accepted, remove this appeal from the reach of *Ramirez–Burgos*. Moreover, at least one circuit has observed that, under *Witte*, all double jeopardy appeals that raise nonfrivolous multiple punishments arguments must now be considered ripe for immediate review. *See United States v. Baird*, 63 F.3d 1213, 1215 & n. 4 (3d Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 909, 133 L.Ed.2d 841 (1996).

■ We elect to detour around this Serbonian bog. It is a familiar tenet that when an appeal presents a jurisdictional quandary, yet the merits of the underlying issue, if reached, will in any event be resolved in favor of the party challenging the court's jurisdiction, then the court may forsake the jurisdictional riddle and simply dispose of the appeal on the merits. *See Norton v. Mathews*, 427 U.S. 524, 530–31, 96 S.Ct. 2771, 2774–75, 49 L.Ed.2d 672 (1976); *Secretary of the Navy v. Avrech*, 418 U.S. 676, 677–78, 94 S.Ct. 3039, 3039–40, 41 L.Ed.2d 1033 (1974) (per curiam); *United States v. Saccoccia*, 58 F.3d 754, 767 n. 6 (1st Cir.1995); *United States v. Connell*, 6 F.3d 27, 29 n. 3 (1st Cir.1993). We follow that course, leaving for another day the questions surrounding the continued vitality of *Ramirez–Burgos*.

## III. THE DOUBLE JEOPARDY CLAIM

We confine our discussion to the branch of the Double Jeopardy Clause that embodies the constitutional protection against multiple punishments.[3] Though our analysis proceeds in three segments, we pause at the brink to acknowledge a few well-established principles.

■ First, though former jeopardy is a criminal law concept, it is by now settled that, if other conditions are met, either criminal prosecutions or civil proceedings instituted by the same sovereign may result in punishment sufficient to implicate the Double Jeopardy Clause. *See United States v. Halper*, 490 U.S. 435, 443, 109 S.Ct. 1892, 1899, 104 L.Ed.2d 487 (1989). Second, not all civil sanctions constitute cognizable punishment. To separate wheat from chaff, an inquiring court must scrutinize a civil sanction objectively rather than subjectively for, from the defendant's standpoint, "even remedial sanctions carry the sting of punishment." *Id.* at 447 n. 7, 109 S.Ct. at 1901 n. 7. Third, as long as a civil sanction constitutes punishment in the relevant sense, it does not matter if the "multiple" punishment—presumably a criminal sentence—precedes the attempt to impose the sanction, or conversely, if the sanction precedes the attempt to convict the defendant. Notwithstanding the difference in sequence, the Double Jeopardy Clause reaches both situations. *See United States v. Hudson*, 14 F.3d 536, 540 (10th Cir.1994); *United States v. Reed*, 937 F.2d 575, 577 n. 3 (11th Cir.1991).

These principles help courts to solve the routine questions that are posed when civil sanctions are alleged to run afoul of the Double Jeopardy Clause. Nevertheless, when a court confronts the task of determining the status of a particular civil penalty under double jeopardy analysis, extremely

---

**2.** In *Witte*, the defendant moved to dismiss an indictment on the ground that the conduct underlying it had already been taken into account when he was sentenced on a previous charge. The defendant argued that the prosecution of the new charge subjected him to multiple punishments for the same offense in violation of the double jeopardy guarantee. *See Witte*, —— U.S. at ——, 115 S.Ct. at 2204–05. He convinced the district court but the court of appeals reversed. 25 F.3d 250, 252 (5th Cir.1994). On certiorari, the Supreme Court declared the claim to be "ripe at this stage of the prosecution—although petitioner has not yet been convicted of the [second charge]—because, as we have said, 'courts

may not impose more than one punishment for the same offense and prosecutors ordinarily may not attempt to secure that punishment in more than one trial.'" —— U.S. at ——, 115 S.Ct. at 2205 (quoting *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977)).

**3.** On appeal, Stoller makes a feeble effort to reformulate his double jeopardy challenge to encompass the notion of successive prosecutions. Since he did not raise this theory below, we will not waste time on it now. *See United States v. Slade*, 980 F.2d 27, 30 (1st Cir.1992). In all events, the belated contention adds nothing of consequence to Stoller's asseverational array.

sophisticated questions can sometimes arise. The answers to those questions may depend on the trilogy of Supreme Court cases to which we now repair.

## A. *The Trilogy.*

The seminal case is *Halper.* There the government successfully prosecuted criminal charges against a physician who, it asserted, had defrauded the federal Medicare program on sixty-five separate occasions. The judge imposed a prison sentence and a fine. *See Halper,* 490 U.S. at 437, 109 S.Ct. at 1895–96. Thereafter, the government brought a civil suit against Dr. Halper under the False Claims Act, 31 U.S.C. §§ 3729–3730, seeking to recover damages plus a penalty equal to $2,000 per violation. The district judge, after contrasting the extent of the government's claim for these items ($131,170) with the provable amount of the loss occasioned by Dr. Halper's defalcations ($585), awarded the government $16,000. The judge reasoned that a more munificent award would be so disproportionate as to constitute punishment and would therefore raise double jeopardy questions. *See Halper,* 490 U.S. at 438–39, 109 S.Ct. at 1896–97. The Supreme Court ultimately accepted this reasoning,[4] finding double jeopardy to be a matter of concern "where a fixed-penalty provision subjects a[n] ... offender to a sanction overwhelmingly disproportionate to the damages he has caused." *Id.* at 449, 109 S.Ct. at 1902.

The *Halper* Court offered some insights into when particular civil penalties might be regarded as punishments in the relevant sense. Making such a determination "requires a particularized assessment of the penalty imposed and the purposes the penalty may fairly be said to serve. Simply put, a civil as well as a criminal sanction constitutes punishment when the sanction as applied in the individual case serves the goals of punishment." *Id.* at 448, 109 S.Ct. at 1901–02. Withal, *Halper* did not brand every monetary penalty exceeding actual financial loss as punitive per se. To the contrary, the Court stated that "the Government is entitled to rough remedial justice, that is, it may demand compensation according to somewhat imprecise formulas, such as reasonable liquidated damages or a fixed sum plus double damages, without being deemed to have imposed a second punishment for the purpose of double jeopardy analysis." *Id.* at 446, 109 S.Ct. at 1900. It is only when the recovery is "not rationally related to the goal of making the Government whole" that the prospect of multiple punishment looms. *Id.* at 451, 109 S.Ct. at 1903. It is in this context that the *Halper* dichotomy surfaced: Justice Blackmun wrote that "a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term." *Id.* at 448, 109 S.Ct. at 1902.

In *Austin v. United States,* 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993), the Court mulled a constitutional challenge to the civil forfeiture of property (Austin's home and business) used to facilitate narcotics transactions. After deciding that the Excessive Fines Clause, U.S. Const.amend. VIII, reached punitive sanctions levied in nominally civil proceedings, *see id.* at ——, 113 S.Ct. at 2805–06, Justice Blackmun invoked his own invention—the *Halper* dichotomy—as an aid in determining how a particular sanction might be characterized. Responding to concerns articulated by Justices Scalia and Kennedy (each of whom concurred in the judgment but wrote separately), Justice Blackmun suggested that under *Halper* "the question is whether forfeiture serves *in part* to punish, and one need not exclude the possibility that forfeiture serves other purposes to reach that conclusion." *Id.* at —— n. 12, 113 S.Ct. at 2810 n. 12 (emphasis in original). While Justice Blackmun acknowledged that "the forfeiture of contraband itself may be characterized as remedial because it removes dangerous or illegal items from society," he declined to extend that reasoning to the sovereign's confiscation of a defendant's

---

**4.** The Court did not affirm, but instead vacated the award and remanded for a more precise determination of the government's actual loses.

*See Halper,* 490 U.S. at 452, 109 S.Ct. at 1903–04.

home and business (even though drug trafficking may have occurred there). *Id.* at ——, 113 S.Ct. at 2811. Moreover, "the dramatic variations in the value of ... property forfeitable" under the applicable civil forfeiture statutes undermined any serious claim that such forfeitures merely provided appropriate compensation for the government's losses. *Id.* at ——, 113 S.Ct. at 2812. In other words, forfeitures of random magnitude were punitive in nature mainly because of sheer vagariousness.[5]

The capstone of the trilogy is *Department of Revenue v. Kurth Ranch,* —— U.S. ——, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994). There the Supreme Court revisited its double jeopardy jurisprudence and found that a Montana tax on the possession of illegal drugs constituted a punishment. *See id.* at ——, 114 S.Ct. at 1948. Justice Stevens, writing for the majority, abjured the *Halper* dichotomy. He explained this shift of focus on the basis that "*Halper*'s method of determining whether the exaction was remedial or punitive simply does not work in the case of a tax statute." *Id.* (citation and internal quotation marks omitted).[6]

In lieu of the inelastic *Halper* dichotomy the *Kurth Ranch* Court advocated a more flexible approach and undertook to evaluate the defendant's double jeopardy claim through an examination of the aggregate circumstances surrounding the imposition of the tax. *See id.* at ——, 114 S.Ct. at 1946–48. Marshaling the pertinent facts, the Court remarked the tax's high rate, obvious deterrent purpose, and linkage with the taxpayer's commission of a drug-related crime, *see id.* at ——, 114 S.Ct. at 1946–47, and took particular note of the fact that the property to be taxed was no longer in the taxpayer's posses-

sion, *see id.* at ——, 114 S.Ct. at 1948. Accordingly, the Court judged the tax to be punitive and held that its assessment after the taxpayer had been convicted and sentenced for the underlying narcotics offense would constitute double jeopardy. *See id.*

## B. *The Analytic Framework.*

█ The threshold question is whether the *Halper* dichotomy furnishes the beacon by which we must steer in evaluating Stoller's double jeopardy claim. We hold that the dichotomy—the *Halper* Court's litmus test for determining the nature of a civil sanction—is limited to cases involving fines, forfeitures, and other monetary penalties designed to make the sovereign whole for harm or loss that is quantifiable in actual or approximate monetary terms. In other cases, the preferred method of analysis is the totality-of-the-circumstances test employed in *Kurth Ranch.* Thus, the *Halper* dichotomy is inapposite in the typical debarment case (as here).

1. In *Kurth Ranch,* —— U.S. at ——, 114 S.Ct. at 1948, the Court recognized the limitations of the dichotomy conceived in *Halper* and nourished in *Austin.* The *Halper* dichotomy is serviceable in the context of a fine, forfeiture, or other monetary penalty that is itself quantifiable in dollars and is intended to correspond with a quantifiable loss. In such situations, a simple mathematical computation reveals with some degree of precision whether the penalty is in proportion to the misconduct.[7] This comparison, in turn, determines the nature of the sanction: the sanction is either restitutionary in an approximate sense (and, hence, remedial) or it is not (and, hence, punitive). This is a

---

**5.** *Austin* is likely not the last word on civil forfeitures in these purlieus. The Court has taken certiorari in two forfeiture cases that feature double jeopardy challenges. *See United States v. Ursery,* 59 F.3d 568 (6th Cir.1995), *cert. granted,* —— U.S. ——, 116 S.Ct. 762, 133 L.Ed.2d 707 (1996); *United States v. $405,089.23,* 56 F.3d 41 (9th Cir.1995), *cert. granted,* —— U.S. ——, 116 S.Ct. 762, 133 L.Ed.2d 707 (1996).

**6.** Elaborating on this theme, Chief Justice Rehnquist (with whom the majority agreed on this point) explained that "the purpose of a tax statute is not to recover the costs incurred by the

government for bringing someone to book for some violation of law, but is instead to either raise revenue, deter conduct, or both." *Id.* at ——, 114 S.Ct. at 1949 (Rehnquist, C.J., dissenting).

**7.** Even in such cases, the dichotomy has a troubling aspect. *See Austin,* 509 U.S. at —— n.*, 113 S.Ct. at 2813 n.* (Scalia, J., concurring) (questioning the language used by Justice Blackmun because virtually by definition a "statutory forfeiture must *always* be at least 'partly punitive'") (emphasis in original).

practical, easily administered rule of thumb—but it operates satisfactorily only because the extent to which a monetary exaction exceeds actual loss is quantifiable. Where that is so—as in *Halper*—the test works; but in other kinds of cases—as in *Kurth Ranch* and here—the dichotomy is dysfunctional.[8]

We think that *Halper* itself recognized these limitations. The holding of the *Halper* Court—a holding that appeared in the very next sentence following the sentence that framed the dichotomy—is "that under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution." 490 U.S. at 448–49, 109 S.Ct. at 1902. A significantly disproportionate monetary sanction cannot fairly be characterized as remedial and, thus, must be regarded as being in service to punitive ends (deterrence or retribution). Non-monetary sanctions elude such facile classification. Indeed, many non-monetary sanctions are hybrids; while not solely in service to remedial goals, they cannot fairly be characterized as serving only punitive purposes. We believe it is for this reason that the *Halper* Court, knowing many civil sanctions would not fit the analytic mold it had cast for use in connection with certain types of monetary penalties, stressed the circumscribed nature of its holding and styled its dichotomous approach as "a rule for the rare case." *Id.* at 449, 109 S.Ct. at 1902.

We are unwilling to accept Stoller's contention that *Austin* signals a widening of *Halper*'s purposefully narrow holding. In *Austin*, the applicable statute purportedly entitled the government to recover property used to facilitate drug transactions regardless of the property's value in relation to the amount of drugs purveyed or the losses to the government occasioned thereby. *See Austin*, 509 U.S. at ——, 113 S.Ct. at 2812.

The defendant's challenge to the forfeiture pivoted on the Excessive Fines Clause, not the Double Jeopardy Clause. *See id.* at ——, 113 S.Ct. at 2812 n. 14. Although the Court often interchanges precedents under these clauses, *Austin* is a case in which the source of the challenge possessed decretory significance. In assessing multiple punishment claims under double jeopardy analysis, the answer to the dispositive question ultimately depends on whether a sanction is "punitive." By contrast, in pondering a claim under the Excessive Fines Clause, the answer to the dispositive question ultimately depends on whether a sanction is "excessive." *See id.* To arrive at a judgment on excessiveness, a reviewing court must necessarily determine if the fine is in proportion to the harm inflicted and/or the loss sustained—and it must apply that criterion regardless of whether the harm or loss is quantifiable. *See Alexander v. United States*, 509 U.S. 544, ——, 113 S.Ct. 2766, 2776, 125 L.Ed.2d 441 (1993). It follows that, in double jeopardy cases involving non-monetary sanctions, we can read very little into the *Austin* Court's commentary.

2. Moving beyond the trilogy, the weight of appellate authority buttresses our binary conclusion that in double jeopardy cases (a) the *Halper* method of analysis is the exception while the *Kurth Ranch* method is the general rule, and (b) strictly speaking, the *Halper* dichotomy does not apply to non-monetary sanctions. *See, e.g., United States v. Hernandez–Fundora*, 58 F.3d 802, 806 (2d Cir.) (refusing to extend the *Halper* dichotomy to a prisoner's claim that his conviction and sentence on charges of assault, after correctional authorities had meted out disciplinary segregation for the same offense, violated the multiple punishments branch of the Double Jeopardy Clause), *cert. denied,* —— U.S. ——, 115 S.Ct. 2288, 132 L.Ed.2d 290 (1995). While the Supreme Court has not yet decided a case raising a double jeopardy challenge to a criminal prosecution that stalks behind the issuance of a debarment

---

**8.** While *Kurth Ranch* dealt with a quantifiable monetary penalty—a tax—it did not involve the satisfaction of a quantifiable loss. Tax statutes are not usually predicated on a calculation of damages or costs sustained by the sovereign through the taxpayer's acts, and the tax statute at issue in *Kurth Ranch* (which imposed a tax of the greater of $100 per ounce of marijuana or ten percent of its market value, *see* —— U.S. at ——, 114 S.Ct. at 1941) is no exception.

order, several courts of appeals have considered and rejected such challenges in the reflection of *Halper*.

In *Reed*, 937 F.2d at 577, the Eleventh Circuit declined to apply the *Halper* dichotomy to an employment proscription. *Reed* involved a double jeopardy challenge to an indictment for misappropriation of postal funds that followed a thirty-day disciplinary suspension imposed by an arbitrator for the same conduct. The court labelled the *Halper* dichotomy "inapposite" in cases involving non-monetary sanctions. *Id.* at 578. But the court's rejection of the dichotomy was by no means a rejection of *Halper* itself. The court found guidance—as do we—in the general principles discussed by the *Halper* Court, and, adumbrating the methodology that the Supreme Court later adopted in *Kurth Ranch*, the *Reed* panel examined the overall circumstances in order to determine whether the proscriptive sanction should be characterized as punitive or remedial. *See id.*

The same court also declined to apply *Halper* in a case that bears a distinct family resemblance to the case at bar. In *Manocchio v. Kusserow*, 961 F.2d 1539 (11th Cir. 1992), the court found no double jeopardy barrier to an administrative order excluding a physician from participating in the federal Medicare program for at least five years, notwithstanding that the order followed the doctor's conviction and sentencing on criminal charges of Medicare fraud. Dismissing the physician's lament that the debarment order, from his perspective, was unarguably punitive, the court determined the sanction to be remedial. *See id.* at 1542 (stating, *inter alia*, that "the purpose of . . . exclusion is to protect the public, a legitimate nonpunitive goal"). Because the agency "did not assess monetary damages," the court ruled that "*Halper*'s analysis . . . does not apply." *Id.* Instead, it focused on the totality of the circumstances. *See id.*

To be sure, these decisions predate *Austin*—but because debarment does not come within the Excessive Fines Clause as we understand it, *see Browning–Ferris Indus. v.*

*Kelco Disposal, Inc.*, 492 U.S. 257, 264–65, 109 S.Ct. 2909, 2915, 106 L.Ed.2d 219 (1989) (holding that the Excessive Fines Clause is implicated only when a party must make "a payment to a sovereign as punishment for some offense"),[9] nothing in *Austin* diminishes their vitality. More to the point, *Kurth Ranch*, a post-*Austin* case, makes it pellucid that, when there is no occasion for an inquiry into financial proportionality, the classic *Halper* framework does not fit. *See Kurth Ranch*, —— U.S. at ——, 114 S.Ct. at 1948.

Two other courts of appeals have arrived at the same destination by a more roundabout route. In *Hudson*, 14 F.3d 536, the Tenth Circuit faced a scenario on all fours with the scenario presented here. Acting under the identical statute that the FDIC employed vis-a-vis Stoller, 12 U.S.C. § 1818(e), the Comptroller of the Currency initiated administrative proceedings against several individuals. He succeeded in securing debarment orders and agreements for partial restitution. *See Hudson*, 14 F.3d at 538. The government later pressed criminal charges based on the same course of conduct. *See id.* In analyzing the ensuing double jeopardy challenge, the Tenth Circuit, echoing *Halper*, stated "that a sanction should be considered punishment if it is not solely remedial," but placed a gloss on this statement, explaining "that a determination that a sanction is at least in part punishment requires that it *must* be explained as also serving as a deterrent or retribution, not merely that it *may* be so explained." *Id.* at 540 (emphasis in original). The court then pointed out that while § 1818(e) may serve to punish lawbreakers, "it does not follow that all sanctions are necessarily presumed to be punitive when the [statute's] express language . . . also allows for remedial sanctions." *Id.* at 541. Applying these tenets, the court concluded that the debarment orders did not comprise punishments and, therefore, rebuffed the claim of former jeopardy. *See id.* at 542.

In *Bae v. Shalala*, 44 F.3d 489 (7th Cir. 1995), the Seventh Circuit used a similar mode of analysis in turning aside an ex post

---

9. Stoller has not argued that the Excessive Fines Clause applies in this case; and, insofar as we can tell, no such argument was advanced in either *Reed* or *Manocchio*.

facto challenge to a debarment order. The court assumed the primacy of *Halper* and started from the premise that, unless a civil sanction can "fairly be said solely to serve a remedial purpose," it constitutes punishment. *Id.* at 493 (quoting *Halper,* 490 U.S. at 448, 109 S.Ct. at 1901–02). But the court added:

> A civil sanction that can fairly be said solely to serve remedial goals will not fail under *ex post facto* scrutiny simply because it is consistent with punitive goals as well. A civil sanction will be deemed to be punishment in the constitutional sense only if the sanction "may not fairly be characterized as remedial, but *only* as a deterrent or retribution."

*Id.* (quoting *Halper,* 490 U.S. at 449, 109 S.Ct. at 1902) (emphasis supplied in *Bae*). After considering the history and nature of the statute authorizing the Food and Drug Administration to ban persons from participating in the pharmaceutical industry, the court concluded that the order excluding Bae was consistent with a remedial purpose and, therefore, not punitive. *See id.* at 494–96.

The difference in approach between the Eleventh Circuit, on one hand, and the Seventh and Tenth Circuits, on the other hand, may be more one of emphasis than of substance.[10] Certainly, the results reached in these three circuits are entirely consistent and the courts' approaches put them on nearly identical courses. The Eleventh Circuit, while eschewing the *Halper* dichotomy in debarment situations, heeds *Halper*'s animating principle. *See, e.g., Reed,* 937 F.2d at 578 (describing the employment suspension as constituting "the rough remedial justice permissible as a prophylactic governmental action") (internal quotation marks and citations omitted). The other two circuits embrace this same principle whilst departing from a strict rendition of the *Halper* dichotomy. *See, e.g., Bae,* 44 F.3d at 493. Moreover, the Seventh Circuit acknowledges that hybrid sanctions can pass constitutional muster: a modicum of punitive effect will not poison a sanction that is essentially remedial. *See id.* (conceding that "[t]he punitive effects

of the [debarment] are merely incidental to its overriding purpose to safeguard the integrity of the generic drug industry while protecting public health"). This last statement is reminiscent not only of *Reed* and *Manocchio* but also of the position advocated by the Second Circuit (albeit on different facts). *See Hernandez–Fundora,* 58 F.3d at 806 ("[T]he mere fact that a sanction imposed by prison officials has a punitive component does not mean that the sanction constitutes 'punishment' for double jeopardy purposes.").

Despite these similarities in approach, we think it is prudent to adopt one of the competing methodologies as a guide to courts and litigants in this circuit. Writing with the added illumination of *Kurth Ranch,* we conclude that, to the extent the circuits' approaches are inconsistent, the directness of the Eleventh Circuit's analysis in *Reed* is preferable because it best effectuates the Supreme Court's admonition that the *Halper* dichotomy should not be applied too far afield from its original context (monetary sanctions designed to make the government whole for traceable losses). *See Kurth Ranch,* —— U.S. at ——, 114 S.Ct. at 1948. In addition, the more inclusive totality-of-the-circumstances test provides a sounder barometer for measuring whether a debarment order or an analogous non-monetary sanction constitutes punishment. We so hold.

### C. *The Merits of the Claim.*

■■■ We turn next to the question whether the instant debarment order constitutes punishment within the purview of the Double Jeopardy Clause. This task does not require us to make a blanket determination of whether *all* debarment orders are remedial as opposed to punitive. Rather, we shine the light of our gleaned understanding on the particular sanction imposed under the particular circumstances on the particular defendant in order to ascertain its character. *See Halper,* 490 U.S. at 448, 109 S.Ct. at 1901 (directing "a particularized assessment of the penalty imposed and the purposes that the penalty

---

**10.** Indeed, both the Seventh and Tenth Circuits have rejected double jeopardy challenges to debarment orders in the post-*Halper* era without discussing the dichotomy. *See, e.g., United States*

*v. Furlett,* 974 F.2d 839, 844–45 (7th Cir.1992); *United States v. Bizzell,* 921 F.2d 263, 267 (10th Cir.1990).

may fairly be said to serve"). For this purpose, we assume—but do not decide—that the debarment order and the nine "misapplication" counts lodged in the indictment arise out of the same events and rest upon the same elements.[11]

We conduct our inquiry by considering the totality of the circumstances, including the source of the authority under which the debarment is imposable, the goals underpinning the authorizing statute, the order itself, the purposes it serves, and the circumstances attendant to its promulgation. *See Kurth Ranch,* — U.S. at —, 114 S.Ct. at 1946–47. In the course of this tamisage, we give weight to a variety of factors such as the severity of the civil sanction; its relationship to legitimate, non-punitive aims; the extent to which the legislature acted to deter potential wrongdoers, or conversely, to shield the public; and the nexus (if any) between the civil sanction and the crime that it allegedly punishes. *See id.* Because our interest is in deterrating the overall nature of the sanction, no one factor, standing alone, is likely to be determinative.

1. The authorizing statute, 12 U.S.C. § 1818(e)(1), is reprinted in the appendix. The statute itself offers relatively little guidance; it simply permits regulators to seek debarment orders as long as three conditions are fulfilled. First, the predicate conduct must consist of (a) violating a law, regulation, or agency order, (b) engaging in (or condoning) an unsafe or unsound banking practice, or (c) committing a breach of fiduciary duty. *See id.* § 1818(e)(1)(A). Second, the conduct must have (a) caused real or probable loss, (b) actually or potentially prejudiced depositors' interests, or (c) resulted in gain to the perpetrator. *See id.* § 1818(e)(1)(B). Third, the conduct must have (a) involved personal dishonesty, or (b)

"demonstrate[d] willful or continuing disregard . . . for the safety or soundness of" the financial institution. *Id.* § 1818(e)(1)(C). Whenever these three conditions coalesce, the agency (here, the FDIC) may issue a debarment order. *See id.* § 1818(e)(1). Such an order will apply industry-wide unless otherwise specified. *See id.* § 1818(e)(7)(A).

These conditions, on their face, are arguably consistent with punishment and remediation alike. For example, although the statute's culpability requirement is reminiscent of the criminal code, such a requirement, in and of itself, does not mandate a finding of punitive intent. *See Hudson,* 14 F.3d at 542. By the same token, the statute's evident concern for both depositors' interests and financial institutions' well-being strongly suggests a remedial goal, but does not, in and of itself, mandate a finding of remedial intent. What tends to tip the balance is that, under § 1818(e)(1), the authority to debar is not tied to a finding that the targeted individual has committed a crime. Just as the presence of an explicit link between a civil penalty and the commission of a crime makes it more likely that the penalty will be deemed punitive for double jeopardy purposes, *see Kurth Ranch,* — U.S. at —, 114 S.Ct. at 1947, so, too, the fact that a civil penalty can be imposed whether or not the targeted individual has committed a crime makes it more likely that the penalty will be deemed remedial, *see, e.g., Thomas v. Commissioner,* 62 F.3d 97, 101 (4th Cir.1995).

In reaching the conclusion that § 1818(e)(1), on its face, displays colors more consistent with the remedial end of the spectrum, we reject Stoller's argument that Congress's failure to enact stringent standards circumscribing agency discretion in respect

---

**11.** Under *United States v. Dixon,* 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993), a double jeopardy claim does not take wing simply because the same conduct underlies two sets of charges. Rather, the defendant must demonstrate that the charges contain identical elements. *See id.* at —, 113 S.Ct. at 2856, 2860. Stoller claims that the requisite identity exists here between the FDIC's administrative charges and the first nine counts of the indictment (alleging violations of 18 U.S.C. § 656). The govern-

ment disagrees. It suggests that the elements are not congruent because § 656 requires proof of a misapplication of bank funds *and* willfulness or intent to injure the bank, whereas § 1818(e) contains an element of loss causation in lieu of the willfulness requirement. Since the debarment order does not constitute punishment, *see* text *infra,* we emulate the court below and leave this issue unaddressed. *See Stoller,* 906 F.Supp. at 40 n. 2.

to debarment renders debarment orders punitive in nature. Simple logic refutes this proposition, and the case law uniformly contradicts it.[12] *See, e.g., Bae,* 44 F.3d at 496 (characterizing a debarment order as remedial notwithstanding the authorizing statute's lack of limiting standards); *Hudson,* 14 F.3d at 542 (similar).

The legislative history of § 1818(e)(1) is helpful. Fairly read, this history reflects congressional aims far more compatible with remediation than with punishment. Congress first enacted the proscription provision in 1966. The report that accompanied the bill limned the reasons prompting the desired reforms:

> The Federal supervisory agencies in varying degrees have been seriously handicapped in their efforts to prevent irresponsible and undesirable practices by deficiencies in the statutory remedies. Experience has often demonstrated that the remedies now available to the Federal supervisory agencies are not only too drastic for use in many cases, but are also too cumbersome to bring about prompt correction and promptness is very often vitally important.

S.Rep. No. 1482, 89th Cong., 2d Sess. 1, 5 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3532, 3537. When taken in light of the Committee's manifold concerns about the safety of the nation's financial institutions, *see id.* at 3536–38, the quoted language comprises a patent indication that Congress intended debarment primarily to protect depositors from scurrilous bank officials. This is a vitally important datum: using a civil sanction to safeguard the integrity of the banking industry and protect the interests of depositors fulfills a remedial purpose. *See Hudson,* 14 F.3d at 541–42.

Nothing in the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA) alters this outlook. Though FIRREA expanded the scope of possible proscription beyond the offending official's own bailiwick and for the first time authorized an industry-wide ban, *see* 12 U.S.C. § 1818(e)(7), it did not otherwise change the substance of the debarment provision. The only significant legislative history dealing with the industry-wide ban addresses the exceptions regulators are empowered to make and explains them in essentially remedial terms. *See, e.g.,* H.R.Rep. No. 54(I), 101st Cong., 1st Sess. 1, 468, (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 264; H.R.Conf.Rep. No. 222, 101st Cong., 1st Sess. 393, 440 (1989), *reprinted in* 1989 U.S.C.C.A.N. 432, 479. The other changes accomplished by Title IX of FIRREA are a mixed bag and, in the aggregate, shed little illumination. The short of it is that the annals of FIRREA offer no convincing reason to infer that Congress intended to alter the fundamental (remedial) nature of the debarment provision.

Stoller resists this conclusion, plucking a single sentence from FIRREA's lengthy legislative history. The House Report, in its introduction to FIRREA Title IX, states that "[t]his Title gives the regulators and the Justice Department the tools which they need … to punish culpable individuals, to turn this situation around, and to prevent these tremendous losses to the Federal deposit insurance funds from ever again recurring." H.R.Rep. No. 54(I), *supra,* 1989 U.S.C.C.A.N. at 262. But this language applies to Title IX as a whole, not to the debarment provision per se. The immediately preceding sentence explains that Title IX is intended both to enhance the FDIC's regulatory powers and to strengthen applicable criminal justice provisions with a view to "restoring public confidence in the nation's financial system and serv[ing] to protect the public interest." *Id.* Read in tandem, these sentences suggest that Congress visualized industry-wide debarment as a remedial device, notwithstanding that the bill included other emendations that were calculated to increase punishments.

To sum up, the legislative history undergirding the debarment provision indicates

---

**12.** Stoller's reliance on *United States v. Bizzell,* 921 F.2d 263 (10th Cir.1990), is misplaced. There, the district court, although concluding that the debarment order was not punitive, rested its decision in part on statutory limitations attendant to the government's proscriptive powers. *See id.* at 265. But the court of appeals did not adopt this rationale, affirming instead on the general remedial purposes underpinning that statutory scheme. *See id.* at 267.

that Congress gave the FDIC removal power for remedial purposes, and FIRREA does not suggest that Congress experienced a change of heart.

■ 2. Double jeopardy problems must be examined in their actual application. *See Halper,* 490 U.S. at 447, 109 S.Ct. at 1901. Moving from the general to the specific, we inspect the circumstances under which the FDIC sanctioned Stoller. Our assay is hampered because the regulators' decisions are opaque in certain respects. The ALJ did little more than find that the statutory preconditions to proscription had been met. Similarly, the Board's initial decision merely stated that "the serious nature of [Stoller's] unsafe or unsound conduct and serious breaches of fiduciary duty merit prohibition from participating in the conduct of the affairs of any other federally insured depository institution." *In re Stoller,* No. 90–115e, at 23–24 (FDIC Feb. 18, 1992) (Board Dec. I). This explanation seems equally consistent with either remedial or punitive aims; the Board might have thought Stoller, as a continuing participant in the banking community, likely to present an ongoing threat to the public, or it might simply have thought that he deserved severe punishment.

The Board's second decision furnishes a more transparent window into its cerebrations, and resolves this amphiboly. That decision (in which the Board extended Stoller's exile by prohibiting him from acting as counsel to any financial institution) persuasively demonstrates that the Board intended debarment to serve a remedial end. The Board reasoned that the very nature of a lawyer's relationship with a bank provides a unique opportunity for double dealing. *See In re Stoller,* No. 90–115e, at 9 (FDIC Sept. 22, 1992) (Board Dec. II). Hence, debarment orders should sweep broadly to ensure that rogue lawyers do not have repeated opportunities to bilk banks. *See id.* at 8. Because "an attorney representing a financial institution, like the institution's directors and officers, occupies a position of trust and has important fiduciary obligations to the financial institution," *id.* at 9, the attorney has "a significant opportunity to harm the institution." *Id.* Applying these principles, the Board ordered debarment in the most wide-ranging terms. It wrote "that Stoller could not be trusted to put the bank's interests before his own." *Id.* at 10. On this basis, the order seems unquestionably to be remedial.

Struggling against this pointed explication of the Board's rationale, Stoller asseverates that the debarment order cannot be viewed as remedial because the FDIC did not assess the danger that continued involvement on his part posed to the banking system or to depositors. His asseveration lacks force.

■ In the first place, the FDIC is not required to make specific findings on the magnitude of a potential threat to the nation's financial institutions. *Halper* expressly recognizes that civil sanctions need not be precisely calibrated in order to survive scrutiny under the Double Jeopardy Clause as long as they work "rough remedial justice." 490 U.S. at 446, 109 S.Ct. at 1900. We think that this principle is fully transferable to the debarment context. When, as now, the government demonstrates a pattern of systematic wrongdoing involving large sums of money, a debarment order may properly be said to work rough remedial justice without a detailed prognostication regarding the probable extent of the wrongdoer's future misconduct, if unchecked. *See United States v. Furlett,* 974 F.2d 839, 844 (7th Cir.1992); *Manocchio,* 961 F.2d at 1542; *see also United States v. Winter,* 22 F.3d 15, 17 (1st Cir.1994) ("It is common wisdom that past is prologue, foreshadowing the future."). Here, the Board, based on Stoller's pervasive misconduct, could reasonably conclude that he represented a major threat to the banking industry, and that a broad debarment order would serve prophylactic purposes.

In the second place, Stoller's claim that the Board did not consider the risk he presented to the banking industry is incorrect as a matter of fact. The Board's attention to this issue is not only evident from the parts of the decisions that we have cited, but it is also made manifest by the Board's discussion of a possible reprieve from the industry-wide ban. In that regard, the Board wrote that the FDIC would have a future opportunity to determine whether Stoller "could perform

work on behalf of [federally insured depository institutions] without undue risk to those institutions." Board Dec. II at 11. This statement not only reflects the Board's worries about imperilling the public but also highlights the conditional nature of the ban—a fact that itself militates in favor of a finding that the sanction is remedial as opposed to punitive.[13] *See Hudson*, 14 F.3d at 542.

■ **3.** Where, as here, double jeopardy analysis proceeds under an appraisal of the totality of the circumstances, a civil sanction need not be solely remedial to pass constitutional muster. In other words, the fact that something akin to punishment occurs along with, and incidental to, a sanction's overriding remedial purpose will not transform a permissible civil penalty into a prohibited multiple punishment. *See Hernandez–Fundora*, 58 F.3d at 806; *Bae*, 44 F.3d at 493. Having examined § 1818(e)(1), the applicable legislative history, the circumstances attendant to Stoller's duplicity, and the rationale underlying the Board's issuance of the specific debarment order at issue here, we discern a single unifying thread: protection of the integrity of the nation's financial institutions. This comports with the root purpose of debarment: to purge sensitive industries of corruption and thereby protect the public. This purpose, evident here, is essentially remedial in nature.

We need go no further. Although the durationally indefinite order of proscription directed against Stoller is harsh, we do not believe that it is disproportionate to the remedial goals of § 1818(e)(1). Nor is the debarment order out of proportion to Stoller's wrongdoing. This is a salient consideration because an individual's misconduct frequently informs the need for remediation. *See Hudson*, 14 F.3d at 542; *Furlett*, 974 F.2d at 844. Here, Stoller caused the Bank to suffer extensive losses, and did so by the most devious means—playing shell games with real estate trusts, abusing a position of

trust, and duping others by concealing his interests in financial transactions. In our judgment, the Board's decision to ban Stoller indefinitely from all association with the banking industry "reasonably can be viewed as a remedial measure commensurate with his wrongdoing." *Furlett*, 974 F.2d at 844. Put another way, industry-wide debarment, in the circumstances of this case, produces rough remedial justice.

## IV. CONCLUSION

When the powers of government are arrayed against an individual, courts must be vigilant to ensure that the individual is not punished twice for the same offense through an artifice in which one punishment masquerades as a civil sanction. Yet the fear of potential abuse should not be allowed to sweep away common sense. Regulators who act principally to safeguard the integrity of the industries that they oversee or to shield the public from the machinations of unscrupulous persons are representatives of the sovereign—but they are not purveyors of punishment in a constitutionally relevant sense. In the end, then, courts must distinguish carefully between those sanctions that constitute impermissible exercises of the government's power to punish and those that constitute permissible exercises of the government's remedial authority (even if effectuating a specific remedy sometimes carries with it an unavoidable component of deterrence or retribution).

Taking into account the totality of the circumstances, we hold that the debarment order imposed by the FDIC is predominantly remedial in nature. Because it does not constitute a punishment under appropriate double jeopardy analysis, the district court did not err in denying the motion to dismiss various counts contained in the indictment.[14]

*Affirmed.*

---

**13.** We do not mean to suggest that a permanent ban would necessarily be punitive. *See Bae*, 44 F.3d at 495 (explaining that "the duration or severity of an employment restriction will not mark it as punishment where it is intended to further a legitimate governmental purpose").

**14.** We note in passing that we would reach an identical result if we evaluated the debarment order under the *Hudson/Bae* variation on the *Halper* theme instead of under the totality of the circumstances.

## STATUTORY APPENDIX

### I. *Debarment.*

(1) Authority to issue order.—Whenever the appropriate Federal banking agency determines that—

(A) any institution-affiliated party has, directly or indirectly—

(i) violated—

(I) any law or regulation;

(II) any cease-and-desist order which has become final;

(III) any condition imposed in writing by the appropriate Federal banking agency in connection with the grant of any application or other request by such depository institution; or

(IV) any written agreement between such depository institution and such agency;

(ii) engaged or participated in any unsafe or unsound practice in connection with any insured depository institution or business institution; or

(iii) committed or engaged in any act, omission, or practice which constitutes a breach of such party's fiduciary duty;

(B) by reason of the violation, practice, or breach described in any clause of subparagraph (A)—

(i) such insured depository institution or business institution has suffered or will probably suffer financial loss or other damage;

(ii) the interests of the insured depository institution's depositors have been or could be prejudiced; or

(iii) such party has received financial gain or other benefit by reason of such violation, practice, or breach; and

(C) such violation, practice, or breach—

(i) involves personal dishonesty on the part of such party; or

(ii) demonstrates willful or continuing disregard by such party for the safety or soundness of such insured depository institution or business institution,

the agency may serve upon such party a written notice of the agency's intention to remove such party from office or to prohibit any further participation by such party, in any manner, in the conduct of the affairs of any insured depository institution.

12 U.S.C. § 1818(e)(1) (1994).

### II. *Industry-wide Prohibition.*

(A) In general.—Except as provided in subparagraph (B), any person who, pursuant to an order issued under this subsection ... has been removed or suspended from office in an insured depository institution or prohibited from participating in the conduct of the affairs of an insured depository institution may not, while such order is in effect, continue or commence to hold any office in, or participate in any manner in the conduct of the affairs of ... any insured depository institution ....

(B) Exception if agency provides written consent.—If, on or after the date an order is issued under this subsection which removes or suspends from office any institution-affiliated party or prohibits such party from participating in the conduct of the affairs of an insured depository institution, such party receives the written consent of [the relevant federal agencies], subparagraph (A) shall, to the extent of such consent, cease to apply to such party with respect to the institution described in each written consent.

12 U.S.C. § 1818(e)(7) (1994).

### III. *Offenses Charged in the Indictment.*

The superseding indictment handed up on January 4, 1995, charged Stoller with violating various criminal statutes. Those statutes provide in pertinent part:

Whoever, being an officer, director, agent or employee of ... any ... national bank or insured bank ... embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank ... shall be [punished as provided by law] ....

18 U.S.C. § 656 (1988).

Whoever ... as an officer, director, employee, agent, or attorney of a financial institution, corruptly solicits or demands for the benefit of any person, or corruptly accepts or agrees to accept, anything of value from any person, intending to be

influenced or rewarded in connection with any business or transaction of such institution ... shall be [punished as provided by law]....

18 U.S.C. § 215(a) (1988).

Whoever makes any false entry in any book, report, or statement of [a federally insured] bank with intent to injure or defraud such bank, or any other company, body politic or corporate, or any individual person, or to deceive any officer of such bank, or the ... Federal Deposit Insurance Corporation ... [s]hall be [punished as provided by law].

18 U.S.C. § 1005 (1988).

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 2 (1988).