867 A.2d 1050

Timothy B. BOYLE, et al.

v.

MARYLAND–NATIONAL CAPITAL PARK
AND PLANNING COMMISSION.

No. 53, Sept. Term, 2004.

Court of Appeals of Maryland.

Feb. 9, 2005.

**144**

Cary J. Hansel (Timothy F. Maloney, Joseph, Greenwald & Laake, P.A., Greenwalt, on brief), for petitioner.

Adrian Robert Gardner, General Counsel, Riverdale, for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and LAWRENCE F. RODOWSKY (Retired, Specially Assigned), JJ.

WILNER, J.

Petitioners Timothy Boyle and Jeffrey Pauley were once employed as park police officers by the Montgomery County Park Police Division of the Maryland–National Capital Park and Planning Commission (Commission). In April, 2000, the Park Police Division commenced an investigation into secondary business activities pursued by petitioners through a Delaware company they had formed, Mobile Data Technologies, LLC (MDT). The investigation focused on whether Boyle and Pauley were using their official positions and Commission property and resources to further conflicting private interests. As it initially proceeded, the investigation was subject to the Law Enforcement Officers Bill of Rights (LEOBR), formerly codified in Maryland Code, Art. 27, §§ 727–734D and now codified as §§ 3–101 through 3–113 of the Public Safety Article.

In May, 2000, during the pendency of the investigation, Boyle and Pauley resigned their positions with the Commission, and the Park Police Division eventually terminated fur-

ther LEOBR proceedings. The Division turned over the results of the investigation to the Commission's General Counsel, however, and General Counsel then filed a petition with the Commission's Purchasing Manager to debar Boyle and Pauley from participating in any procurement activity before the Commission.[1]

While that petition was pending and before any resolution of it by the Purchasing Manager, Boyle, Pauley, and MDT filed an action in the Circuit Court for Prince George's County seeking, among other things, (1) a declaratory judgment that the debarment proceeding conflicted with LEOBR, and (2) an injunction to restrain the Commission from proceeding with the debarment. The basic issue was whether debarment constituted "punitive" action within the meaning of the LEOBR and thus made applicable the procedural rights afforded under that statute, notwithstanding that Boyle and Pauley were no longer employed by the Commission as law enforcement officers. Although Boyle and Pauley represented that they had no intention of ever seeking procurement contracts from the Commission, they claimed that debarment by the Commission might affect their ability to bid on contracts with other government agencies.

After ruling on some preliminary motions and staying proceedings to permit the parties to attempt to resolve their dispute through mediation, the court ruled that any debarment proceeding by the Commission must be conducted in conformance with LEOBR—essentially, a hearing before a police hearing board with the Chief of Police ultimately determining whether they had engaged in conduct warranting debarment.[2] The Court of Special Appeals reversed that

---

1. "Debarment" is a term commonly used in public procurement laws and regulations. It denotes an order or ruling that renders a person or entity ineligible to bid on or be awarded a public contract by reason of conduct that, in conformance with an authorizing statute or regulation and in the judgment of the procuring agency, makes the person or entity unfit to be a contractor with that agency.

2. The trial judge regarded MDT as having been dismissed from the action in the Circuit Court, although there is nothing in the record to

determination, concluding, in an unreported opinion, that debarment proceedings do not constitute "punitive" action within the meaning of LEOBR and that LEOBR procedures were therefore inapplicable. We granted *certiorari* to review the judgment of the intermediate appellate court. We agree with that judgment but, for technical reasons, shall vacate it and remand the case for entry of an amended judgment.

## BACKGROUND

The Commission is a bi-county agency created by the General Assembly to develop both general and functional plans of proposed land development for the Washington Metropolitan District, which consists of most of Montgomery and Prince George's Counties. *See* Maryland Code, Art. 28, § 7–108. That is the main "planning" function. In carrying out the general plan, the Commission is authorized to acquire property within the District for roads, parks, forests, and other recreation facilities, and to improve and control such property for those purposes. *See id.* § 5–101. That is the main "park" function.

The Commission currently administers about 56,000 acres of park and recreation land in the District. In furtherance of its "park" function, the Commission is authorized by § 5–114 to appoint park police officers to provide protection for the Commission's activities and property. Those officers have concurrent general police jurisdiction, in and on Commission property, with Montgomery and Prince George's County police officers, but they are responsible to and are under the supervision of the Commission. *Id.* § 5–114(a).

Although the record is skimpy in this regard, it appears that some functions of the Commission are handled by the central Commission staff while others are implemented by geographically-based Divisions of the Commission within each of the two counties. Among the functions handled centrally are human

document any such dismissal. It is unimportant, as all parties agree that, as an entity and not a law enforcement officer, MDT is not entitled to any benefit under LEOBR.

resources, finance, and general counsel, and included within the finance department is general procurement for the Commission. Among the functions handled by Divisions within the respective counties is the police function. There is a separate Park Police Division, headed by a Chief and having its own command and administrative structure, in each of the two counties. Whether there is an overall chief of police at the central headquarters level is unclear to us from the record we have.[3]

Boyle and Pauley worked for the Montgomery County Park Police Division and were under the supervision of Elizabeth Kreiter, who was then the Chief of the Montgomery County Park Police Division. Chief Kreiter reported to Donald Cochran, Chief of Park Police. Chief Cochran had delegated certain LEOBR duties to Chief Kreiter, including the authority to initiate investigations and rule on all punishment other than summary punishment, but he, apparently, was the ultimate chief for LEOBR purposes.

In 1998, Boyle, by then a lieutenant, became commander of the Management and Technology Branch of the Division, and he later assumed the position of Acting Assistant Chief of that Branch.[4] The duties and responsibilities of the branch com-

---

**3.** The record is woefully deficient in a number of important respects, among which is a clear description of the structure and organization of the Commission generally and the Park Police Division in particular. How procurement authority is allocated is also unclear. There are references to Boyle having procurement authority—indeed that lies at the heart of the Commission's case—yet it appears that procurement authority rests with the Purchasing Manager and the Finance Department. There is no clear delineation of the duties of the Chief of the Montgomery County Park Police Division (Kreiter) and the Chief of Park Police (Cochran)—whether Cochran was part of the Montgomery County Park Police Division or was the "super chief" at the Commission central headquarters level to supervise the Division chiefs in the two counties.

**4.** There appears, now, to be seven branches of the Montgomery County Division of the Commission Park Police—Professional Standards, Field Operations, Management and Technology, Patrol, Special Operations, Investigative Services, and Special Services—all reporting to and under the supervision of the Chief. Whether that is the Division Chief

mander were quite general and somewhat vague: "supervision and management of areas within the Management and Technology Branch as assigned by the branch Assistant Chief." As Acting Assistant Chief of the Branch, Boyle became responsible for all of the functions of that branch, including budget and procurement, research and development, and technology projects.[5] One of the units in the Management and Technology Branch was the Information Technology Systems Unit which, in September, 1998, Boyle appointed Pauley, a sergeant, to head.

That unit had a defined function. It was responsible for conducting all technology-related research, the development of plans for the implementation of new programs and systems, and the updating of existing programs and systems. That included, according to the Commission, researching and testing hardware and software for possible use by the Montgomery County Park Police, initiating the procurement of contracts with hardware and software vendors, administering those contracts and monitoring the vendors, and authorizing payments to the vendors. A major part of that responsibility was administering a program designed to equip Park Police vehicles with "mobile data" capability—laptop computers and accompanying software that would enable officers to access vehicle records, criminal history information, and other law enforcement information while on patrol.

In November, 1998, while employed in those capacities, Boyle and Pauley created MDT as a Delaware Limited Liability Company. The nature of the business, according to the tax returns filed by Boyle and Pauley, was "consulting on public safety." They did not disclose the existence of MDT to the Commission.

(Kreiter) or the Chief of Park Police (Cochran) is unclear. According to the applicable Division Directive, one needed to be a lieutenant to be a branch commander and a captain to be an assistant chief of a branch.

5. As noted, the record does not make clear what procurement authority Boyle or Pauley actually had.

On April 10, 2000, Division Chief Kreiter, upon information received from a subordinate, checked the web site for MDT and learned that, through MDT, Boyle and Pauley appeared to be dealing with vendors who supplied goods and services to the Commission. Concerned that such activity might constitute a conflict of interest, she immediately initiated an LEOBR investigation, to focus on (1) whether Boyle or Pauley had violated any Commission rules in their relationship with outside vendors who were also Commission vendors, and (2) whether they had used Commission property or equipment for personal use.

Two weeks later, on April 27, 2000, Chief Cochran suspended Boyle and Pauley, with pay, pending the outcome of the investigation and advised them of their right to a hearing on the suspension. That same day, Division Chief Kreiter sent two directives. One, addressed to Pauley, requested his consent to a search of his office, his assigned vehicle, and other areas in his workplace. Pauley signed the consent.[6] The second directive, addressed to both Boyle and Pauley, ordered them among other things, (1) not to return to their office or any other Park Police facility without permission from her, not to access any computer or communication system operated by the Park Police, and not to represent MDT or any other entity with any entity that did or had done business with the Commission, and (2) to disclose, by May 5, 2000, a wide range of records and information, including all financial accounts held or accessible by them or held by MDT from and after January 1, 1995, tax returns, records relating to their relationship with MDT or any other entity, and records showing or relating to appointments from and after January 1, 1995.

At the request of Boyle and Pauley, the deadline for producing the records was extended to May 12, but, when no response to the demand was forthcoming by then, they were, on May 17, formally charged with failure to obey that order and informed of the Commission's intention to fine them one

---

**6.** The record does not reveal whether a similar request was sent to Boyle.

day's pay, commencing as of May 13, for each day until they complied with the order.[7] Upon receipt of that insubordination charge, Boyle and Pauley requested an LEOBR hearing but immediately resigned their positions, as of May 19, 2000.

Notwithstanding their resignations, the investigation and the LEOBR proceeding continued. Chief Kreiter explained that the investigation proceeded because she was not sure at that point whether any of the Commission vendors or any other Commission staff were involved and had violated Commission directives and policies; the investigation, in other words, was broader than just Boyle and Pauley. On June 30, 2000, the hearings requested by Boyle and Pauley were scheduled for July 25 and 26, 2000, but, when their attorney advised that he had a trial conflict, the hearings were postponed. The Commission continued to press for compliance with the directive to produce records. In response, counsel asserted that the Commission no longer had jurisdiction over the two men because they had retired, but, after some further correspondence, some documents were turned over in September, 2000.

The hearings were apparently never rescheduled, and the LEOBR proceeding against Boyle and Pauley was administratively closed on January 11, 2001. A final report of the investigation was not prepared until June, 2001, however. Chief Kreiter, who had briefed General Counsel's office and the Purchasing Manager for the Commission as the investigation proceeded, sent a copy of that report to General Counsel. Working with General Counsel's office, she prepared a summary of the report for the Purchasing Manager and ultimately assisted in drafting the Petition for Debarment that was filed before the Purchasing Manager on or about July 17, 2001.

The petition is based to a large extent on the information that came to light through the LEOBR investigation, including that part of the investigation that occurred after Boyle and Pauley resigned. We need not recite, or even summarize, all

---

7. It is not clear whether that charge was made by Division Chief Kreiter or Acting Director of Parks Lester Straw. It appears to have been made by Straw and countersigned by Kreiter.

of the allegations in the 48–page petition. It basically avers that Boyle and Pauley, in secretly pursuing their private business while working for the Commission, violated a number of ethical and procedural requirements, including conflict of interest provisions relating directly to procurement and their own official duties, and that they misappropriated and misused Commission property and funds. The petition alleges, in those regards, that they steered substantial Commission business to three vendors with which they, or MDT on their behalf, had established private business relationships.

Section 16 of the Commission's Purchasing Manual, dealing with debarment, lists among the grounds for debarment "[v]iolation of the ethical standards set forth in Section 2 of this manual," and "[a]ny other cause the Purchasing Manager determines to be so serious and compelling as to affect responsibility as a Commission contractor." Section 2 of the Manual, dealing with Ethics in Purchasing, makes it a breach of ethical standards for a Commission employee (1) to participate directly or indirectly in a procurement action in which a conflict of interest may exist, or (2) to use the employee's public position for private gain. Debarment is determined by the Purchasing Manager, subject to an appeal to the Executive Director of the Commission and judicial review. On the allegations of the petition, General Counsel and Chief Kreiter asked that Boyle, Pauley, MDT, and a company that they believed had purchased MDT be barred from participating in any procurement activity that the Commission may undertake for the maximum period of time allowed by law.

On August 31, 2001, before any proceedings took place on the petition, Boyle, Pauley, and MDT brought this action for declaratory and injunctive relief to thwart the debarment proceeding. They alleged that (1) debarment proceedings are controlled by Maryland Code, §§ 16–101 *et seq.* of the State Finance and Procurement Article, which preempt the Commission's procedures; (2) the pending debarment proceeding is subject to, but fails to comply with, LEOBR; and (3) the lack of procedural protections afforded by the pending debarment proceeding would deprive the plaintiffs of their right to

procedural due process of law under Article 24 of the Maryland Declaration of Rights. They sought a declaratory judgment confirming those averments and, through injunctive and mandamus relief, an order barring the Commission from proceeding with the debarment.

The Commission responded with a motion to dismiss and for summary judgment. With respect to the LEOBR claim, it asserted that, by resigning, the plaintiffs had waived their right to LEOBR proceedings and that such proceedings, in any event, were inappropriate in light of the plaintiffs' resignation in that they could not result in any punitive action against them. It is not clear whether the court ever ruled definitively on the first and third complaints made by Boyle and Pauley—preemption and due process—but those issues were not raised in their petition for *certiorari* and are therefore not before us. On March 10, 2003, the court filed a Memorandum Opinion and Order in which it concluded that Boyle and Pauley were entitled to the procedural rights afforded by the LEOBR, notwithstanding their resignations, and "[t]he fact that disciplinary sanctions are no longer available to remedy the alleged wrongdoing does not preclude the determination by [an LEOBR] hearing board." The court formally denied the request for declaratory judgment on the ground that a statutory remedy—the LEOBR proceeding—was available, but it did enjoin the Commission from continuing debarment proceedings "unless and until charges against [Boyle and Pauley] are sustained in proceedings pursuant to [LEOBR]." [8]

As noted, the Court of Special Appeals reversed that judgment. It looked to the relevant provision of LEOBR, at the

8. The court's conclusion that declaratory relief was inappropriate because a statutory procedure was available is puzzling. It may have had more merit had it been based on the availability of, and failure to exhaust, the administrative remedy before the Purchasing Manager, but not based on the court's determination that the LEOBR procedure was available. That was the very issue presented to the court—whether the LEOBR procedure was applicable—and both sides were entitled to a declaratory judgment resolving it.

time Article 27, § 730(a) and now § 3–107(a) of the Public Safety Article, which reads, in relevant part:

> "[i]f the investigation or interrogation of a law enforcement officer results in a recommendation of demotion, dismissal, transfer, loss of pay, reassignment, *or similar action that is considered punitive,* the law enforcement officer is entitled to a hearing on the issues by a hearing board before the law enforcement agency takes that action."

(Emphasis added).[9]

The issue, recognized by both the Circuit Court and the Court of Special Appeals, was whether debarment was a "similar action that is considered punitive" within the meaning of that statute. If not, the right to an LEOBR hearing did not apply. The intermediate appellate court noted that the enumerated list—demotion, dismissal, transfer, loss of pay, reassignment—were all punitive actions related to the officer's employment relationship, and, applying the doctrine of *ejusdem generis,* concluded that the general reference to "similar action that is considered punitive" was likewise intended to include "only those actions that are of the same nature as the enumerated actions, that is, punitive actions related to the law enforcement officer's employment [as a law enforcement officer]." As debarment could have no effect on Boyle's or Pauley's employment with the Commission in any capacity, it was not a similar punitive measure within the meaning of the statute, and the LEOBR simply did not apply.

Before us, Boyle and Pauley urge that debarment *is* punitive in nature, that the doctrine of *ejusdem generis* does not apply, and that, even if it did, it would not preclude application of LEOBR to the debarment proceeding.

## DISCUSSION

 The parties agree, and properly so, that the issue is one of statutory construction—the scope of the phrase "or

---

9. We shall use the current articulation in the Public Safety Article, which was taken without substantive change from former Article 27.

similar action that is considered punitive," as used in what is now § 3–107(a) of the Public Safety Article. As we have so often held, when construing a statute, "[o]ur preeminent goal is to discern and implement legislative intent, and, to do that, we begin with the plain meaning of the statutory language." *Walker v. Dept. of Human Resources*, 379 Md. 407, 420, 842 A.2d 53, 61 (2004); (citing *Allstate v. Kim*, 376 Md. 276, 290, 829 A.2d 611, 619 (2003)). Important in determining legislative intent, however, "is the purpose of the statutory scheme of which the statute under review is a part." *Breitenbach v. N.B. Handy*, 366 Md. 467, 474, 784 A.2d 569, 573 (2001).

■ Thus the issue: Did the Legislature intend that phrase to include a proceeding by an agency to prevent persons who had once been, but were no longer, law enforcement officers employed by the agency from bidding on and being awarded procurement contracts due to conduct committed while so employed? As Boyle and Pauley seem to concede that no one in the Park Police Division, including the Chief of the Park Police, is authorized to debar them from bidding on or being awarded procurement contracts, the question becomes whether they are nonetheless entitled to have a police hearing board, selected in accordance with LEOBR, determine whether they committed conduct during their employment that could then serve as a basis for debarment by the Purchasing Manager or the Executive Director of the Commission.

Instructive is *Fraternal Order of Police v. Mehrling*, 343 Md. 155, 680 A.2d 1052 (1996). A Montgomery County police officer was charged with and found guilty of having engaged in secondary employment without approval from the Chief of Police and the County Ethics Commission, approval that was required by a county regulation as a condition to such employment. The question was whether the Chief of Police was authorized under LEOBR, as a "punitive measure," to prohibit the officer from engaging in any secondary employment for three months. Our answer was "no," because we concluded that the relevant county regulations dealing with secondary

employment did not vest the Chief of Police, substantively, with that authority.

Citing several earlier cases, we confirmed that the purpose of LEOBR was to provide procedural safeguards for law enforcement officers during any investigation and subsequent hearing that might result in disciplinary action. We quoted from *Moats v. City of Hagerstown*, 324 Md. 519, 526, 597 A.2d 972, 975 (1991) that the purpose of LEOBR was to establish an exclusive procedural remedy for a police officer "in *depart-mental* disciplinary matters." (Emphasis added). Noting that the primary function of LEOBR was to provide "a procedural framework for the protection of law enforcement officers subject to disciplinary action," we concluded that the statute was "not an effective vehicle for defining the types of disciplinary sanctions available to the Chief." *Mehrling, su-pra*, 343 Md. at 183, 680 A.2d at 1066.

█ Implicit in that conclusion is that the LEOBR procedural protections apply only when there is a prospect of disciplinary action or punitive measure that is within the substantive authority of the Chief of Police to impose. The function of the hearing board is to make findings of fact and conclusions of law in aid of a recommendation to the Chief of "the penalty it considers appropriate under the circumstances, including demotion, dismissal, transfer, loss of pay, reassignment, or other similar action that is considered punitive." Public Safety Article, § 3–108(b). It is the Chief who makes the final decision. If there is no possible disciplinary action that the Chief can impose, even upon a sustaining of every charge made against the officer, the hearing board procedure serves no function; it leads nowhere.

That is precisely the situation here. Because of their resignation, the employment relationship that Boyle and Pauley had with the Park Police has been entirely terminated; there is no lingering connection that can be affected by any order that the Chief of Police can make. Boyle and Pauley were not seeking reinstatement as police officers; they were not seeking to withdraw their resignations. There is no

sanction—no punitive measure—that the Chief of Police can impose. As noted, the parties agree that the Chief of Police has no authority whatever to order debarment. Under Section 16 of the Commission Purchasing Manual, only the Purchasing Manager, subject to appeal to the Executive Director of the Commission, may order, terminate, or modify debarment. There is no provision for any LEOBR hearing board to make recommendations to the Purchasing Manager regarding debarment.

Two other considerations also coalesce in support of the conclusion that LEOBR is inapplicable in this situation. The first is the *ejusdem generis* doctrine applied by the Court of Special Appeals. *Ejusdem generis* is a canon of statutory construction "that when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same type as those listed." BLACK'S LAW DICTIONARY 556 (8th ed.2004). Quoting from 2A SUTHERLAND STAT. CONST. § 47.18, at 200 (5th ed.1992), this Court has noted that:

> "The doctrine of *ejusdem generis* applies when the following conditions exist: (1) the statute contains an enumeration by specific words; (2) the members of the enumeration suggest a class; (3) the class is not exhausted by the enumeration; (4) a general reference supplementing the enumeration, usually following it; and (5) there is not clearly manifested an intent that the general term be given a broader meaning than the doctrine requires."

*In re Wallace W.,* 333 Md. 186, 190, 634 A.2d 53, 55–56 (1993) (italics supplied); *see also Degren v. State,* 352 Md. 400, 427, 722 A.2d 887, 900 (1999). Although the doctrine, being only a rule of construction, should not be invoked "to restrict the meaning of words within narrower limits than the statute intends, so as to subvert its obvious purpose," *Blake v. State,* 210 Md. 459, 462, 124 A.2d 273, 274 (1956), *State Dep't. of Assess. & Tax v. Belcher,* 315 Md. 111, 121, 553 A.2d 691, 696 (1989), its use here supports, rather than subverts, the statutory intent. The specific kinds of sanctions listed all relate, and

are limited, to actions affecting the officer's employment relationship as an officer, and there is no "clearly manifested intent" that the catchall phrase "similar action that is considered punitive" cover actions that do not and cannot affect the officer's employment relationship.[10]

■ Finally, despite Boyle and Pauley's contention to the contrary, debarment, as provided for in the Commission's purchasing manual, is not a punitive measure, but a remedial one. Their position rests largely on their stated intention never to bid on Commission contracts. In light of that, they claim, debarment cannot be remedial, as there is nothing to remedy, so it must be punitive. Its only effect, they assert, is to make it difficult for them to obtain contracts from other government agencies to whom they will be required to disclose debarment by the Commission.

There are three responses to that argument. The most obvious, of course, is that they could change their currently stated position at any time. More significantly, debarment is intended to work prospectively, before bidding starts. If there is cause to debar a prospective bidder, even one who, at the moment, claims no interest in bidding, that ought to be resolved, whenever possible, in a proceeding unconnected to any pending procurement action. Otherwise, if Boyle or Pauley or some entity with which they may be connected were to attempt to submit a bid on some future contract, the bidding process could be seriously disrupted by an attempt then to debar them or not accept their bid. Their current disinterest in doing business with the Commission may be considered by the Purchasing Manager in deciding whether to proceed, but it does not preclude her from proceeding.

---

10. We do not mean to suggest that the resignation or retirement of an officer while an LEOBR investigation is pending necessarily requires that the investigation be terminated. For one thing, as here, the investigation may explore activity or culpability on the part of other persons. There may, in addition, possibly be punitive measures that could be imposed notwithstanding the resignation or retirement, although that is an issue we need not and do not address here.

Finally, in presenting that argument, Boyle and Pauley rely on three cases, none of which are on point. In *Wisconsin Dept. of Industry v. Gould, Inc.*, 475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986), the Court struck down, as preempted by the National Labor Relations Act (NLRA), a Wisconsin statute that precluded State procurement agents from purchasing any product known to be manufactured or sold by a person who had been found to have violated the NLRA in three separate cases within a five year period. The Court held that, "[b]ecause Wisconsin's debarment law functions unambiguously as a supplemental sanction for violations of the NLRA, it conflicts with the [National Labor Relations] Board's comprehensive regulation of industrial relations in precisely the same way as would a state statute preventing repeat labor law violators from doing any business with private parties within the State." *Id.* at 288, 106 S.Ct. at 1062, 89 L.Ed.2d at 229. In a footnote to a succeeding sentence, the Court observed that "[t]he conflict between the challenged debarment statute and the NLRA is made all the more obvious by the essentially punitive rather than corrective nature of Wisconsin's supplemental remedy.... Wisconsin's debarment sanction [in contrast to the remedial nature of NLRA regulation] functions as punishment and serves no corrective purpose." *Id.* at 288 n. 5, 106 S.Ct. at 1062 n. 5, 89 L.Ed.2d at 229 n. 5.

The *Wisconsin* case certainly illustrates that a debarment statute, depending on how it is drafted, can be punitive in nature. As the other two cases cited by Boyle and Pauley also make clear, however, that is not how the more traditional debarment statutes are construed. In *United States v. Hatfield*, 108 F.3d 67 (4th Cir.1997), the court considered whether a Federal debarment regulation was sufficiently punitive in nature as to bar, on double jeopardy grounds, the subsequent criminal prosecution of a debarred contractor based on the same conduct that led to his debarment. Writing for the court, Judge Niemeyer observed that the debarment proceeding was informal, that it was designed as a civil proceeding subject to a preponderance of evidence standard, that debar-

ment could not be imposed to punish, but "only to serve the remedial goal of protecting the government," and that debarment for 26 months was not so excessive as to transform what was designed as a civil remedy into a criminal penalty. *Id.* at 69. *United States v. Stoller,* 78 F.3d 710 (1st Cir.1996) is to the same effect.

The debarment provision at issue here is nothing at all like the Wisconsin statute found preempted by the Supreme Court. For one thing, it does not conflict, substantively, with any preemptive Federal or State law. It does not seek to punish, or punish more severely, conduct that any preemptive law pervasively regulates in some other way. There is no automatic debarment based on any event. The causes for debarment include a criminal conviction for certain kinds of offenses, particularly serious violation of existing contracts, the violation of ethical standards set forth in Section 2 of the purchasing manual, violation of the anti-discrimination program set forth in Section 3 of the manual, and, as noted, any other cause that the Purchasing Manager determines to be "so serious and compelling as to affect responsibility as a Commission contractor, including debarment by another governmental entity for any cause listed above." The contractor is entitled to notice and an opportunity to be heard. Following a hearing, if one is requested, the Purchasing manager must render a written decision stating the reasons for the action taken and inform the contractor of his/her right to administrative and judicial review.[11] These circumstances convince us that, like most traditional debarment laws, this one is remedial rather than punitive.

For all of these reasons, we hold that the LEOBR was inapplicable to the debarment proceeding and the Circuit Court erred in concluding otherwise. In light of that conclusion, we need not address whether Boyle and Pauley waived any LEOBR rights by resigning or by reason of some admis-

---

11. Although Boyle and Pauley have at times complained about the lack of clear procedures in a debarment proceeding, that issue is not presently before us.

sion by their attorney. The mandate of the Court of Special Appeals simply reversed the order granting the requested injunction. It should have gone a bit further. As noted above, the parties were entitled to a declaratory judgment on the LEOBR issue, and the case must be remanded so that such a judgment can be entered.

**JUDGMENT OF COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE JUDGMENT OF CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AND TO REMAND TO THAT COURT WITH INSTRUCTIONS TO ENTER PROPER DECLARATORY JUDGMENT IN CONFORMANCE WITH THIS OPINION AND TO DENY REQUEST FOR INJUNCTIVE AND MANDAMUS RELIEF. COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONERS BOYLE AND PAULEY.**