884 A.2d 157

MARYLAND–NATIONAL CAPITAL PARK
AND PLANNING COMMISSION

v.

Kathleen ANDERSON.

No. 00080, Sept. Term, 2004.

Court of Special Appeals of Maryland.

Sept. 30, 2005.

542

William C. Dickerson (Devin J. Doolan, Jr., on the brief), Riverdale, for appellant.

Michael Marshall, Baltimore, for appellee.

Panel: HOLLANDER, JAMES R. EYLER, LAWRENCE F. RODOWSKY (Retired, specially assigned), JJ.

HOLLANDER, J.

In this case of first impression, we must determine whether a police department is entitled to judicial review of a "not guilty" finding rendered by a hearing board convened pursuant to the Law Enforcement Officers' Bill of Rights ("LEOBR"), Md.Code (2003), Title 3, Subtitle 1 of the Public Safety Article ("P.S.").[1] The appeal arises from an alleged unauthorized vehicular pursuit conducted by Kathleen Anderson, appellee, an officer with the Maryland–National Capital Park and Planning Commission (the "Commission"), appellant.

As a result of Anderson's conduct, appellant initiated disciplinary proceedings under LEOBR. After an "Administrative Hearing Board" (the "Board") found appellee not guilty of engaging in an unauthorized vehicular pursuit, the Commission filed a "Petition for Appeal" with the Circuit Court for Prince George's County. Concluding that the Commission

---

1. At the time of the administrative hearing, LEOBR was codified in Article 27, §§ 727–734D of the Maryland Annotated Code (1957, 1996 Repl.Vol.). Effective October 1, 2003, LEOBR was recodified, without substantive change, to P.S. § 3–101 et seq.

was not entitled to judicial review, the circuit court granted Anderson's motion to dismiss.

On appeal, the Commission presents two issues, which we quote:

I. Whether the Circuit Court erred as a matter of law in granting appellee's Motion to Dismiss and, in so doing, finding that appellant Commission is not entitled to judicial review of the final decision of an administrative hearing board pursuant to [§ ] 3–109 of the LEOBR.

II. Whether the Circuit Court erred as a matter of law in granting appellee's Motion to Dismiss and, in so doing, finding that appellant Commission is not entitled to judicial review of the final decision of an administrative hearing board pursuant to [§ ] 10–222 of the Administrative Procedures Act.

For the reasons that follow, we shall affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Commission is a body corporate and an agency of the State. *See* Md.Code Ann. (1957, 2003 Repl.Vol.), Art. 28, § 1–101. Recently, in *Boyle v. Maryland–National Capital Park and Planning Comm'n*, 385 Md. 142, 146, 867 A.2d 1050 (2005), the Court of Appeals outlined the rights and responsibilities of the Commission:

The Commission is a bi-county agency created by the General Assembly to develop both general and functional plans of proposed land development for the Washington Metropolitan District, which consists of most of Montgomery and Prince George's Counties. *See* Maryland Code, Art. 28, § 7–108. That is the main "planning" function. In carrying out the general plan, the Commission is authorized to acquire property within the District for roads, parks, forests, and other recreation facilities, and to improve and control such property for those purposes. *See id.* § 5–101. That is the main "park" function.

Pursuant to Art. 28, § 5–114(a), the Commission "may appoint whatever park police officers as may be necessary to provide protection for the Commission's activities and property." These officers "are responsible to and are under the supervision of the Commission." *Boyle*, 385 Md. at 146, 867 A.2d 1050. The park police also "have concurrent general police jurisdiction with the Montgomery and Prince George's County police within the parks and other areas ... under the jurisdiction of the Commission...." Art. 28, § 5–114(a).

Regarding park police officers, the *Boyle* Court explained, 385 Md. at 146–47, 867 A.2d 1050 (emphasis added):

[S]ome functions of the Commission are handled by the central Commission staff while others are implemented by geographically-based Divisions of the Commission within each of the two counties. Among the functions handled centrally are human resources, finance, and general counsel, and included within the finance department is general procurement for the Commission. *Among the functions handled by Divisions within the respective counties is the police function. There is a separate Park Police Division, headed by a Chief and having its own command and administrative structure, in each of the two counties.*

Since 1998, appellee has served as a Park Police Officer. On September 8, 2001, she was assigned to the midnight shift for the Prince George's County Park Police Division ("the Division"),[2] operating a marked police cruiser equipped with an in-car computer and camera. At approximately 10:30 p.m. on that date, while appellee was on a two-lane residential road in Prince George's County (the "County"), she activated the emergency lights on her patrol car, intending to stop a vehicle bearing license plates that had been reported as stolen. When the vehicle did not stop, appellee activated the siren on her patrol car, and remained in contact with the Division's

---

**2.** Both parties refer to the Prince George's County Park Police "Department," but *Boyle* refers to "geographically-based Divisions" in Prince George's and Montgomery counties. *Boyle*, 385 Md. at 146, 867 A.2d 1050.

"communications" by means of her police radio. At that point, the suspect vehicle exceeded the posted speed limit, crossed the center line, and may have struck another vehicle. As the vehicle was moving, the occupants jumped out. Their vehicle continued to move, without a driver, and struck a telephone pole.

The Commission's policy as to vehicular pursuits is codified in Bi–County Directive 414 ("BCD 414"), effective January 1, 1979, as amended on May 9, 2001. In accordance with the 2001 Amendment, "fresh pursuit" is permitted only

when an officer has probable cause to believe that the fleeing suspect has committed or is attempting to commit the following:

● Any felony involving the use of force or threat of physical force or violence against a person.

● A hit and run traffic accident resulting in death or serious injury[.]

Notably, "[a]ny other pursuits are prohibited."

By "Memorandum" dated October 4, 2002, appellee was notified that she was charged as follows:

**Charge # 1. Failure to comply with Bi–County Rule 2: Conformance to Law**—Officers and employees of these divisions shall obey all laws of the United States, the State of Maryland, County ordinances[,] all rules and directives of these divisions, and the Commission where applicable.

To wit: On September 8, 2001, you engaged in a vehicle pursuit in direct violation of the amendment (dated 5/9/01) to Bi–County Directive 414.

**Charge # 2. Bi–County Directive 414: Fresh Pursuit, Amendment (dated 5/9/01)**—Fresh Pursuit is only allowed when an officer has probable cause to believe that the fleeing suspect has committed or is attempting to commit the following:

Any felony involving the use of force or threat of physical force or violence against a person. A hit-and-run traffic

accident resulting in death or serious injury. Any other pursuits are prohibited.

To wit: On September 8, 2001, you engaged in a vehicle pursuit in direct violation of the Amendment (dated 5/9/01) to Bi–County Directive 414.

**Charge # 3. Bi–County Rule 9: Integrity of Reporting System (A).** No officer or employee shall make or cause to be made, any omission, false, inaccurate, or improper entries in any official record, form or report, nor shall they under any circumstances make any false official statement or intentional misrepresentation of fact.

To wit: On September 8, 2001, you engaged in a vehicle pursuit and then provided a false statement to Sgt. Uhrig when he questioned you.

In light of the charges, the Division informed Anderson that it "intend[ed] to take the disciplinary measure of termination of employment. . . ." Accordingly, appellee exercised her right to an administrative hearing, pursuant to P.S. § 3–107(a), which was held on March 13 and 14, 2003.

Captain Robert Ashton testified that he proposed the 2001 amendment to BCD 414 so it would conform to the more restrictive vehicular pursuit policy adopted by the County. He explained that he wanted to avoid "extreme liability" for the agency.[3]

On October 10, 2001, Ashton spoke with Diane Robertson–Griggs, who claimed she was the driver of a sport utility vehicle struck by the suspect vehicle on September 8, 2001. Following that conversation, Captain Ashton asked Sergeant Daren Uhrig to "retrieve the in-car videotape from Officer Anderson."[4] He also "spoke with Officer Christopher Perry

---

3. The Bi–County Rules and the Bi–County Directive, referred to in the Memorandum of October 4, 2002, were admitted in evidence, without objection.

4. The videotape was admitted into evidence at the hearing, without objection, and was played for the Board. In addition, the audio tape

regarding what he saw on the scene when he went to back up Officer Anderson." Then, he "spoke with Lieutenant [Tom] Kane and made a verbal request for the radio transmission tapes regarding the incident." On October 17, 2001, after having reviewed the requested items, Ashton "wrote a complaint against police practice for this matter to be investigated further."

On cross-examination, Captain Ashton conceded that the mere activation of emergency equipment "doesn't mean you're in pursuit[.]" He also acknowledged that there are "occasions when you follow a vehicle and it's not a pursuit[.]"

Sergeant Uhrig was appellee's supervisor on the night of September 8, 2001. He recalled that, at approximately 10:30 p.m. on September 8, 2001, he was "listening to the [police] radio" when he overheard that "Officer Anderson had called out with a license plate." Uhrig testified: "I believe she asked for [a] registration check on [the] license plate. At some point the registration plate for the vehicle came back stolen. . . . I believe she said the vehicle wasn't stopping. . . ."

According to Sergeant Uhrig, Lieutenant Tom Kane "wanted to know what occurred," and if "there was a fast chase." Uhrig questioned appellee about whether there was a chase, but she "said there wasn't." Uhrig testified: "[B]asically she described the incident. She had turned on the emergency equipment and the vehicle had failed to stop. And then that she had later come upon the vehicle wrecked din [sic] the telephone pole." After speaking with Officer Anderson, Uhrig "didn't think a fast chase had occurred." He added: "From the information I had I felt that she handled it properly."

On the night of September 8, 2001, Lieutenant Kane was the "[o]perations duty officer for Prince George's County patrol. . . ." At approximately 10:30 p.m., while monitoring the radio, Kane received a radio transmission from appellee. He was "concerned enough that [he] made an inquiry whether a

was admitted into evidence, without objection, and was played for the Board.

pursuit had occurred." He also "instructed Sergeant Uhrig to ensure that no chase had taken place, because if it had I would have to do a commander's log before leaving." Uhrig asked appellee to call with her "answer [to] that question." Kane was in Sergeant Uhrig's office when appellee responded. Kane testified that, following the conversation, Sergeant Uhrig "told [him] that there had been no [chase] and there was no need for a performance report." Therefore, Kane took no "further actions" regarding the incident.

Sergeant Harvey Baker interviewed appellee on January 9, 2002.[5] Anderson claimed that, while following the suspect vehicle, she saw "no cars ... on the road.... There was no traffic, no pedestrians." According to appellee, she was "one or two" car lengths behind the suspect vehicle when it struck the telephone pole; the entire incident lasted "between seven and [ten] minutes"; and it extended "maybe two and a half" miles. Officer Anderson denied that she ignored "any traffic control devices in trying to get the vehicle to stop[.]" More-over, appellee estimated that her top speed was "between 35 and 40 [m.p.h.]," in contrast to the posted speed limit of "25 to 30."

Officer Anderson denied that her actions violated BCD 414. When asked by Sergeant Baker whether she pursued the vehicle, appellee responded: "Did I try to get it to stop? Yes. Did I pursue it? I was behind it.—. It happened so quick."

Appellee was the sole witness for the defense. She ex-plained that, as a patrol officer, her duties included observing "vehicles on or about park property." Anderson recalled that she began to follow the suspect vehicle after a registration check revealed that the license plates had been reported as stolen. She indicated that she intended to stop the suspect vehicle along the side of Dupont Heights park property. Appellee insisted that "it wasn't" her "intent to initiate a pursuit," and she denied that a vehicular pursuit ensued.

---

5. The audiotaped interview of appellee and a transcript were admitted into evidence, without objection.

Indeed, Anderson claimed that, while following the vehicle, she decided not to pursue it because it had passed another vehicle, "and went over the double yellow line" into the lane designated for oncoming traffic. She also claimed that she informed communications of her decision. According to appellee, as she prepared to deactivate the emergency equipment, the suspects "turned . . . and then they bailed out while the car was still moving."

On cross-examination, appellee admitted that, while following the suspect vehicle, she crossed over the center line on the roadway, and into the lane for oncoming traffic, in order to pass a civilian motorist. Officer Anderson also admitted that, while following the suspect vehicle, she "was a little over the speed limit." Although appellee insisted that her speed "wasn't excessive," she acknowledged that there were pedestrians "in the road." Officer Anderson also testified that, on the day following the incident, she "received a telephone call about property damage," which she included in her report of the incident. She maintained, however, that, prior to that call, she was unaware of any property damage.

At the close of the hearing, the Board rendered an oral ruling, in which it found appellee not guilty of all of the charges. Thereafter, on June 30, 2003, the Board issued its written "Decision of Hearing Board Relative to PO Kathleen Anderson" (the "Decision"), reciting its findings of fact and the basis for its ruling. Noting that it had "carefully scrutinized all of the testimony and the circumstances under which it was given," the Board made clear that its ruling was "based in part upon its view of the credibility of the witnesses." It also said:

> The Board also considered, among other factors, the state of mind and demeanor of each witness while testifying, his or her opportunity to observe and accurately relate to the matters discussed, whether the testimony has been contradicted, any bias or prejudices of the witnesses, the manner in which the witness may be affected by a decision in the case, and the extent to which the testimony of the witness is supported or contradicted by other evidence. The Board also considered the documentary evidence presented to it

and how that evidence interfaced with the testimony of the various witnesses. In that regard, the Board had copies of the interviews of Officer Anderson.

The Board also had available to it an audio tape and video tape of the alleged pursuit of September 8, 2001. The Board was able to hear and view for itself the circumstances and the events of September 8, 2001.

With these considerations in mind, the Board reasoned that BCD 414 does "not set forth precise guidelines under which an officer may or may not follow a vehicle in an attempt to have said vehicle stop." In the Board's view, "the policies afford the officer some reasonable discretion with respect to making a determination that a vehicle will not stop and that, accordingly, there should not be any continued effort to stop the vehicle." Recognizing that its determination was "a close call" the Board nonetheless concluded that appellee had not violated BCD 414.

In reaching that conclusion, the Board noted that "the audio tape clearly reinforces Officer Anderson's testimony that she had determined to break off any pursuit of the vehicle. . . ." It stated: "The fact that Officer Anderson continued in the direction of the suspect vehicle and approached after the vehicle was abandoned and wrecked did not transform her conduct into a violation of Bi–County Directive 414." Of import here, quoting P.S. § 3–108(a)(3), the Board stated: " 'A finding of Not Guilty terminates the action.' "

The Commission subsequently sought judicial review of the Board's Decision. Appellee responded with a motion to dismiss.

In her motion, appellee contended that the Board, composed of three law enforcement members, all appointed by the chief, "is a quasi-judicial body assembled by [the Commission] for the express purpose of hearing testimony and adjudicating the disciplinary charges against its own officer." Moreover, she claimed that the Commission " 'is not a party to the proceeding before it or before an appellate body authorized to review its decision, and it has no judicially cognizable interest in what

happens to that decision.' " (Citation omitted). Anderson stated: "Absent some special statutory authorization, therefore, [the Board] does not have the right to appeal its own decision." She added that "no provision in legislation establishing or regulating the [Commission] confers upon it the right to appeal its own decisions."

In its opposition, the Commission indicated that it did not seek review of "its own decision" because the "decision at issue is *not* the Commission's decision; rather, it is the decision of an *ad hoc* administrative board mandated by the provisions of the LEOBR." According to appellant, if the Commission were not allowed to obtain judicial review, the result would be to allow the Board to "nullify . . . the police agency's vehicle pursuit regulations without affording the agency or the court an avenue by which to correct the clearly erroneous and unsubstantiated decision."

The Commission also addressed the statutory provision in P.S. § 3–108(a)(3), which states: "A finding of 'not guilty terminates the action.' " In its view, that provision simply expresses that the ruling "constitutes a final decision for purposes of appeal." In this regard, the agency pointed to the absence of "language in the LEOBR limiting the right of appeal to the officer[.]" Appellant added: "The rights of both parties to appeal final LEOBR administrative decisions in no way infringes upon the procedural rights of police officers.[ ]"

Moreover, the Commission contended that it "was a party to the administrative action, serving in a quasi-prosecutorial capacity." Therefore, it insisted that it was entitled to judicial review of the Board's Decision under the Administrative Procedure Act ("APA"), codified in Md.Code (1984, 2004 Repl. Vol.), § 10–222 of the State Government Article ("S.G.").[6]

---

6. Alternatively, appellant argued: "[I]f this Court were to conclude that there exists no statutory authority for the Commission's appeal of the LEOBR Board's final decision, mandamus would provide a common law avenue for judicial review." However, appellant has not pursued the mandamus claim on appeal. *See Criminal Injuries Compensation Board v. Gould,* 273 Md. 486, 331 A.2d 55 (1975).

At the motion hearing held on February 19, 2004, the circuit court questioned appellant's counsel as to why the court should not dismiss the action pursuant to P.S. § 3–108(a)(3). Referring to the absence of express language in LEOBR granting a right of appeal to the Commission, the court stated: "[I]t doesn't say the law enforcement agency has a right to appeal, does it?" The following exchange is relevant:

[COUNSEL FOR APPELLANT]: . . . *It is the Commission's position that [P.S. § ] 3–108 read in conjunction with [P.S. § ] 3–109, which also references judicial review, would conclude that the termination of the action is a final decision by the Trial Board and authorizes the agency to petition for judicial review.*

THE COURT: *Why didn't the legislature then say that?* Say this is a final judgment?

[COUNSEL FOR APPELLANT]: In Section 3–108, the legislature sets forth the decisions that can be made by a trial board and the appellate procedures that can be taken from those decisions. . . .

(Emphasis added).

The court also questioned the Commission's counsel about how to reconcile a right of judicial review for the Commission with P.S. § 3–110, which allows for expungement of a police officer's record in cases of acquittal, dismissal, or a finding of not guilty. The following colloquy is pertinent:

THE COURT: Let me ask you this. If I agree with your argument and I then reverse the Trial Board, can the police officer have her record expunged three years from now?

\* \* \*

[COUNSEL FOR APPELLANT]: I'm not sure that the officer could. It would depend on what the punishment was.

THE COURT: Suppose she's fired.

\* \* \*

[COUNSEL FOR APPELLANT]: I don't believe she has the right to expunge the action from her personnel file, Your Honor.

THE COURT: Then what does this portion of the statute mean, [P.S. § ] 3–110? "On written request, a law enforcement officer may have expunge[d] from any file the record of a formal complaint made against the law enforcement officer if a hearing board acquitted the law enforcement officer, dismissed the action or made a finding of not guilty." What does that mean?

[COUNSEL FOR APPELLANT]: . . . . If this decision was reversed and a finding of guilty was made, then she could not have it expunged. If simply there was—if the finding of not guilty held firm, she could have that expunged from her record.

THE COURT: I've reversed—I've now reversed the Trial Board and I've entered a finding of guilty.

[COUNSEL FOR APPELLANT]: And I believe what an officer for the court [would have to do] would be to remand that to the Board.

THE COURT: Why doesn't [P.S. § ] 110 say that?

[COUNSEL FOR APPELLANT]: Well, I think it doesn't have to because it simply goes to a finding of guilty or not guilty. If it was remanded to—before the Trial Board and the Trial Board came to the conclusion that was—that the proper decision should have been guilty, well then clearly she couldn't have it expunged. If the same decision was rendered [i.e., not guilty], then she could have it expunged. I don't think the legislature needed to get into the detail on that.

Appellant's counsel acknowledged that the purpose of LEOBR "is to protect the procedural rights of law enforcement officers with respect to disciplinary action from a law enforcement agency," but claimed the protections apply "during the investigatory stage and during the hearing stage[.]" On the subject of due process, the court asked: "[I]f you're

allowed to appeal a finding of not guilty, which is precluded from the state in a criminal case, aren't you in effect violating some due process rights ... ?" The court also asked: "[O]ne of the due process elements is a double jeopardy argument, isn't it?" Counsel for appellant responded: "[T]his is not a criminal case. This is an administrative action." When the court observed that the title of the statute is "the Law Enforcement Officer's Bill of Rights," and not "the Law Enforcement Agency's Bill of Rights," appellant responded: "I think the right of the agency for judicial review of an arbitrary [and] capricious decision does not negatively impact the loss of law enforcement officer's procedural rights."

At the close of the hearing, the court granted Anderson's motion to dismiss. The court reasoned:

[T]he titling of this statute is the Law Enforcement Officer's Bill of Rights. It is not the Law Enforcement Agency's Bill of Rights.

... [T]he prior case law interpreting the statute has identified the purpose of the statute to guarantee procedural safeguards and due process right[s] to the law enforcement officer during any investigation or hearing in which the law enforcement officer faces disciplinary proceedings.

In reviewing the language of the statute.... I think the intent of the legislature has previously been identified by our appellate courts in identifying the purpose, being to set procedural safeguards and to guarantee due process rights to the law enforcement officer....

In attempting to harmonize the entire statute, I look at [P.S. § ] 3–110(2)(ii)[,] which deals with the expungement of the record of a formal complaint. And it states that, "On written request a law enforcement officer may have expunged from any file the record of a formal complaint made against the law enforcement officer if a hearing board acquitted the law enforcement officer, dismissed the action or made a finding of not guilty."

That would indicate to me the finding of not guilty terminates the action and is not a final judgment that makes

the action of the Trial Board ripe for appeal by the law enforcement agency.

To find otherwise would make that language inconsistent if I were to accept the appeal and then reverse the finding of the Trial Board.

... I decline to interpret the Administrative Procedure Act in light of [P.S. § ] 3–102 of the Law Enforcement Officer's Bill of Rights which states, "This subtitle supersedes any other law of the state, a county or municipal corporation that conflicts with this subtitle."

Thereafter, on February 24, 2004, the court entered a "Judgment" reflecting its oral ruling. This appeal followed.

## II. DISCUSSION

### A.

Because the statutory scheme of the LEOBR is central to our disposition, we begin with a review of its salient provisions.

LEOBR is contained in Title 3 (entitled "LAW ENFORCEMENT"), Subtitle 1 (entitled *"Law Enforcement Officers' Bill of Rights "*) of the Public Safety Article of the Maryland Code (2003). P.S. § 3–107 provides the procedural framework that governs a police officer's right to a hearing under LEOBR.

### § 3–107. Hearing by hearing board.

(a) *Right to hearing.*—(1) Except as provided in paragraph (2) of this subsection and § 3–111 of this subtitle, if the investigation or interrogation of a law enforcement officer results in a recommendation of demotion, dismissal, transfer, loss of pay, reassignment, or similar action that is considered punitive, the law enforcement officer is entitled to a hearing on the issues by a hearing board before the law enforcement agency takes that action.

(2) A law enforcement officer who has been convicted of a felony is not entitled to a hearing under this section.

■■■■■■■■■■■■■■■■■■■■

(b) *Notice of hearing.*—(1) The law enforcement agency shall give notice to the law enforcement officer of the right to a hearing by a hearing board under this section.

(2) The notice required under this subsection shall state the time and place of hearing and the issues involved.

(c) *Membership of hearing board.*—(1) ... *[T]he hearing board authorized under this section shall consist of at least three members who:*

(i) *are appointed by the chief and chosen from law enforcement officers within that law enforcement agency, or from law enforcement officers of another law enforcement agency with the approval of the chief of the other agency; and*

(ii) *have had no part in the investigation or interrogation of the law enforcement officer.*

(2) At least one member of the hearing board shall be of the same rank as the law enforcement officer against whom the complaint is filed.

\* \* \*

(d) *Subpoenas.*— [7]

\* \* \*

(4) In case of disobedience or refusal to obey a subpoena served under this subsection, the chief or hearing board may apply without cost to the circuit court of a county where the subpoenaed party resides or conducts business, for an order to compel the attendance and testimony of the witness or the production of the books, papers, records, and documents.

---

**7.** We included this subsection because it illustrates that, when it chooses to do so, the Legislature is quite aware of how to make an express grant of rights to the chief.

\* \* \*

(e) *Conduct of hearing.*—(1) The hearing shall be conducted by a hearing board.

(2) The hearing board shall give the law enforcement agency and law enforcement officer ample opportunity to present evidence and argument about the issues involved.

(3) The law enforcement agency and law enforcement officer may be represented by counsel.

(4) Each party has the right to cross-examine witnesses who testify and each party may submit rebuttal evidence. . . .

(Italics in text added).

P.S. § 3–108 is of particular significance. It provides:

### § 3–108. Disposition of administrative action.

(a) *In general.*—(1) A decision, order, or action taken as a result of a hearing under Section 3–107 of this subtitle shall be in writing and accompanied by findings of fact.

(2) The findings of fact shall consist of a concise statement on each issue in the case.

(3) **A finding of not guilty terminates the action.**

(4) If the hearing board makes a finding of guilt, the hearing board shall:

(i) reconvene the hearing;

(ii) receive evidence; and

(iii) consider the law enforcement officer's past job performance and other relevant information as factors before making recommendations to the chief.

(5) A copy of the decision or order, findings of fact, conclusions, and written recommendations for action shall be delivered or mailed promptly to:

(i) the law enforcement officer or the law enforcement officer's counsel or representative of record; and

(ii) the chief.

(b) *Recommendation of penalty.*—(1) After a disciplinary hearing and a finding of guilt, the hearing board may

recommend the penalty it considers appropriate under the circumstances, including demotion, dismissal, transfer, loss of pay, reassignment, or other similar action that is considered punitive.

(2) The recommendation of a penalty shall be in writing.

(c) *Final decision of hearing board.*—(1) **Notwithstanding any other provision of this subtitle, the decision of the hearing board as to findings of fact and any penalty is final if:**

(i) a chief is an eyewitness to the incident under investigation; or

(ii) a law enforcement agency or the agency's superior governmental authority has agreed with an exclusive collective bargaining representative recognized or certified under applicable law that the decision is final.

(2) **The decision of the hearing board then may be appealed in accordance with § 3–109 of this subtitle.**

(3) Paragraph (1)(ii) of this subsection is not subject to binding arbitration.

(d) *Review by chief and final order.*—(1) Within 30 days after receipt of the recommendations of the hearing board, the chief shall:

(i) **review the findings, conclusions, and recommendations of the hearing board; and**

(ii) **issue a final order.**

(2) **The final order and decision of the chief is binding and then may be appealed in accordance with § 3–109 of this subtitle.**

(3) The recommendation of a penalty by the hearing board is not binding on the chief.

(4) The chief shall consider the law enforcement officer's past job performance as a factor before imposing a penalty.

(5) The chief may increase the recommended penalty of the hearing board only if the chief personally:

(i) reviews the entire record of the proceedings of the hearing board;

(ii) meets with the law enforcement officer and allows the law enforcement officer to be heard on the record;

(iii) discloses and provides in writing to the law enforcement officer, at least 10 days before the meeting, any oral or written communication not included in the record of the hearing board on which the decision to consider increasing the penalty is wholly or partly based; and

(iv) states on the record the substantial evidence relied on to support the increase of the recommended penalty.

(Boldface added).

P.S. § 3–109 is also pertinent. It states:

**Section 3–109. Judicial Review.**

(a) *By circuit court.*—An appeal from a decision made under § 3–108 of this subtitle shall be taken to the circuit court for the county in accordance with Maryland Rule 7–202.

(b) *By Court of Special Appeals.*—A party aggrieved by a decision of a court under this subtitle may appeal to the Court of Special Appeals.

P.S. § 3–110 provides:

**Section 3–110. Expungement of record of formal complaint.** On written request a law enforcement officer may have expunged from any file the record of a formal complaint made against the law enforcement officer if:

(1)(i) the law enforcement agency that investigated the complaint:

1. exonerated the law enforcement officer of all charges in the complaint; or

2. determined that the charges were unsustained or unfounded; or

(ii) *a hearing board acquitted the law enforcement officer, dismissed the action, or made a finding of not guilty;* and

(2) at least 3 years have passed since the final disposition by the law enforcement agency or hearing board.

(Italics added).

P.S. § 3–102(a) is also relevant. It provides that the LEOBR "supercedes any other law of the State, a county, or a municipal corporation that conflicts with" it.

As noted, appellant also looks to the APA for a right of appeal. As codified in S.G. § 10–201 *et seq.*, the APA generally confers on all parties the right of judicial review from administrative decisions. S.G. § 10–201 provides:

### § 10–201. Declaration of policy.

The purpose of this subtitle is to:

(1) ensure the right of all persons to be treated in a fair and unbiased manner in their efforts to resolve disputes in administrative proceedings governed by this subtitle; and

(2) promote prompt, effective, and efficient government.

S.G. § 10–222(a) governs judicial review under the APA:

### § 10–222. Judicial review.

(a) *Review of final decision.*—(1) ... [A] party who is aggrieved by the final decision in a contested case is entitled to judicial review of the decision as provided in this section.

(2) An agency, including an agency that has delegated a contested case to the Office [of Administrative Hearings], is entitled to judicial review of a decision as provided in this section if the agency was a party before the agency or the Office [of Administrative Proceedings].

Maryland Rule 7–201(a) is also pertinent. It states, in part: "The rules in this Chapter govern actions for judicial review of (1) an order or action of an administrative agency, *where judicial review is authorized by statute....*" (Emphasis added). Further, Md. Rule 7–202 states: "A person seeking judicial review under this chapter shall file a petition for judicial review in a circuit court authorized to provide the review."

## B.

The Commission contends that the circuit court erred in ruling that, whether under LEOBR or the APA, the Commission "is not entitled to judicial review of the final decision of an administrative hearing board." Therefore, the agency "seeks [judicial] review of the palpably erroneous decision of the three-member board of lay subordinate park police officers who effectively nullified one of the most important of the Commission's public safety regulations." According to the Commission, "absent language in the LEOBR limiting the right of appeal solely to a law enforcement *officer*, the LEOBR should be read to permit the Commission's appeal of the Board's decision." Appellant adds: "Had the Legislature intended to permit a law enforcement *officer's* right to appeal and prohibit a law enforcement *agency's* right to appeal, that restriction would be expressed in the text of [P.S.] Section 3–109(a)."

Moreover, the Commission argues: "[T]he LEOBR does not evidence any affirmative decision or intention by the General Assembly to guarantee, vest or entitle an officer to the favorable decision of a hearing board if that decision was reached unlawfully." Appellant adds: "Although the LEOBR certainly imbues officers with certain procedural rights, there is no language or intent embodied in the statute to shelter such palpable errors of law from all judicial scrutiny."

According to the Commission, the denial of the right of judicial review would shelter a flagrantly erroneous decision of the Board, and deprive a law enforcement agency of its "interest in receiving just and fair consideration during administrative hearings concerning intended employment actions...." The agency adds: "Precluding the Commission from appealing the Board's decision ... would allow the lay *ad hoc* Board to rewrite or nullify the Department's vehicle pursuit regulations without affording the agency, or the court, a means by which to correct such an erroneous legal decision." It "can think of no reason why such autonomy, the likes of

which is not even entrusted to the judiciary, would be delegated to such an entity."

Appellant also maintains that, under P.S § 3–107, the " 'LEOBR hearings approximate a full-blown trial in circuit court,' " (citation omitted), in which "the charging agency and officer charged are properly viewed as party opponents," with the attendant rights to counsel, to present evidence, and to cross-examine witnesses. Because "the hearing board process prescribed under the LEOBR . . . is appropriately considered as an adversarial one," argues appellant, "a decision by the board is not reasonably attributed to the Commission or the chief."

Further, appellant points out that, because P.S. § 3–108(a) "requires that all board decisions be 'in writing and accompanied by findings of fact,' it should follow that 'not guilty' decisions reduced to writing in such a manner are as appealable as 'guilty' decisions." Otherwise, asks appellant rhetorically, "what would be the purpose of findings of fact if there existed no opportunity for judicial review?"

The agency also challenges appellee's contention that it has improperly sought judicial review of "its own" decision. According to the Commission, the trial board "essentially is an impartial tribunal vested with specified statutory authority that is independent of the authority of the chief and the agency." Appellant insists that Board members "maintained no authoritative role within the Commission's structure," and their "decisions had no binding effect on the Commission." In addition, appellant points out that, "because the statute contemplates that the chief may appoint hearing board members who do not belong to his or her agency, it is entirely conceivable that the hearing board may be convened without a single member drawn from the agency that has charged the officer."

Moreover, the Commission maintains that "the language of [P.S.] Section 3–109 in no way expresses an intent to abrogate the right of the agency to judicial review. . . ." While appellant acknowledges that the "unfortunate sentence construction [in P.S. § 3–109(a) ] raises a literal question about whom the

General Assembly intended to authorize to take such an appeal—the law enforcement officer, the law enforcement agency, or both," it insists that "the provision is equally silent concerning the officer's right to judicial review." Therefore, the agency relies on P.S. § 3–109(b), noting that LEOBR specifically authorizes the agency to seek an appeal to this Court from an adverse decision rendered by the circuit court. In appellant's view, "nothing within reach of the statute's plain meaning nor embodied in its ultimate purpose, would support an inference that the General Assembly intended" only to give the Commission a right to appeal to this Court, but not to the circuit court.

Although appellant recognizes that LEOBR "was enacted to ensure that police officers are afforded procedural safeguards during employment-related disciplinary actions," it maintains that "extending the statutory right of appeal" to the police agency does not vitiate the law enforcement officers' procedural rights under LEBOR. The agency asserts: "The fact that an agency might seek appeal of an unfavorable hearing board decision does not in any way 'divest' the law enforcement officer of the procedures followed properly which lead up to that appeal."

In the Commission's view, "[j]udicial review of a LEOBR decision can be harmonized with [P.S.] Section 3–110 of the LEOBR," which grants the officer the right to expungement upon an acquittal. In this regard, the agency maintains that the circuit court's reasoning was "flawed," because judicial review of an administrative decision "carries with it the possibility that the administrative decision will be reversed. . . ."

Alternatively, appellant contends that it has a right of judicial review under S.G. § 10–222. The Commission notes: "Section 10–222 of the APA provides an agency the right to appeal administrative decisions if that agency is a party to the administrative proceeding and is aggrieved by the resulting administrative decision." Citing *Coleman v. Anne Arundel County Police Dep't,* 369 Md. 108, 136, 797 A.2d 770 (2002), and *Tippery v. Montgomery County Police Dep't,* 112 Md.

App. 332, 346–47, 685 A.2d 788 (1996), the Commission points out that Maryland appellate courts have "applied the APA . . . to contested cases held pursuant to the LEOBR." [8]

Anderson focuses on the text of P.S. § 3–108(a)(3) ("A finding of not guilty terminates the action"), arguing that the "plain meaning" of the statute bars judicial review of the Board's not guilty finding. She avers: "[T]he LEOBR makes no reference to a department's appeal of its own decision, and in the context of the statutory scheme of the LEOBR there is no evidence of a legislative intent to even implicitly allow such an appeal, let alone to explicitly authorize it." In contrast, argues Anderson, the statute specifically confers on the officer the right to appeal a finding of guilt.

Appellee asserts: "The LEOBR clearly does not assume nor mandate reciprocity of rights between the agency and the officer." She explains:

By *including* precise, statutory requirements for determining finality of guilty decisions to generate the right to judicial review, the General Assembly signals a clear intent to *exclude* finality for not guilty decisions. The General Assembly was fully capable of drafting the statute in a way to include elaboration as to the meaning of finality of not guilty decisions for appeal purposes if it so intended, but there is no indication of such an intent. The legislature would have framed an equally specific designation or a general statement concerning judicial review of not guilty decisions if it had intended to grant such a right to the agency.

Appellee also agrees with the circuit court that the General Assembly's intent in enacting the LEOBR "was to provide procedural rights to law enforcement officers, not administrative agencies." In her view, to grant the Commission a right to judicial review "would run counter to the purpose of the LEOBR and its intended effect."

---

8. We pause to note that in both *Coleman* and *Tippery* the police officers were found guilty by the respective administrative hearing boards.

Officer Anderson also contends that the Commission is not sufficiently aggrieved "to hold appellate rights pursuant to Section 3–109 of the LEOBR." She reasons that, "while the Commission may have an interest in enforcing its policies with its employees, the Commission is no more affected by the not guilty decision and alleged failure to enforce the policy against vehicular pursuit than the public generally."

Moreover, appellee argues that the Commission does not have a right to judicial review of a "not guilty decision" under the APA. She contends that the APA does not apply here, because it "conflicts with the LEOBR to the extent that it purports to entitle an agency to judicial review of the final decision—a right purposefully excluded from the LEOBR by the General Assembly[.]" In this regard, appellee reminds us that LEOBR specifically provides that, in the event of a conflict with another statute, the LEOBR "supersedes" that statute. Anderson also observes that the Maryland appellate courts have not applied the APA to create a right of judicial review for the agency under the LEOBR.

In addition, Anderson maintains that the Commission "is not a party aggrieved pursuant to the APA." She explains: "The Courts have interpreted [S.G. § ] 10–222(a)(3) to define 'aggrieved' for purposes of the APA by two requirements: a substantial right of the petitioner has been violated and the petitioner may have been prejudiced by a departure from prescribed procedure." According to appellee, the Commission failed to satisfy either prong. As to the second prong of the APA's aggrievement test, Anderson maintains: "The Commission makes no allegation that procedure was circumvented or guidelines were not followed at Officer Anderson's trial board.... Merely because the Board did not reach a guilty finding does not warrant a conclusion that procedures were violated[.]"

Appellee also takes issue with the Commission's assertion that the Board's decision "effectively rewrote and nullified the Department's vehicle pursuit policy." She contends: "Policies were not rewritten. Officer Anderson was found not guilty.

Officers are routinely acquitted at LEOBR Board hearings. Not-guilty decisions do not change policies. . . . "

## C.

▮ "[T]he scope of judicial review in a LEOBR case 'is that generally applicable to administrative appeals.' " *Ocean City Police Dep't v. Marshall*, 158 Md.App. 115, 120–21, 854 A.2d 299 (2004) (citation omitted). But, those principles are inapplicable here, because the circuit court dismissed the appeal without reviewing the merits of the agency's ruling. Instead, the court determined that the Commission did not have the right to appeal the Board's decision, either under LEOBR or the APA.

▮ In considering whether appellant has a right to appeal under the LEOBR, we are presented with a question of statutory interpretation, which we review *de novo*. *See Salamon v. Progressive Classic Ins. Co.*, 379 Md. 301, 307, 841 A.2d 858 (2004). Therefore, the principles of statutory construction frame our analysis.

▮ The interpretation of a statute is a judicial function. *Salamon*, 379 Md. at 307, 841 A.2d 858; *Bennett v. State Dept. of Assessments and Taxation*, 143 Md.App. 356, 367, 795 A.2d 124 (2001); *Rouse–Fairwood Development Ltd. Partnership v. Supervisor of Assessments for Prince George's County*, 138 Md.App. 589, 619, 773 A.2d 535 (2001). Our primary goal in construing a statute is to ascertain and effectuate the intent of the Legislature. *Johnson v. Mayor and City Council of Baltimore City*, 387 Md. 1, 11, 874 A.2d 439 (2005); *Deville v. State*, 383 Md. 217, 223, 858 A.2d 484 (2004); *Motor Vehicle Admin. v. Jones*, 380 Md. 164, 175, 844 A.2d 388 (2004); *Chow v. State*, 163 Md.App. 492, 498–99, 881 A.2d 1148 (2005); *Hackley v. State*, 161 Md.App. 1, 11, 866 A.2d 906 (2005). In this endeavor, we are guided primarily by the statutory text. *See Boyle, supra*, 385 Md. at 154, 867 A.2d 1050 (stating that, "when construing a statute, '[o]ur preeminent goal is to discern and implement legislative intent, and, to do that, we begin with the plain meaning of the statutory language' ")

(citation omitted); *Western Corr. Inst. v. Geiger,* 371 Md. 125, 141, 807 A.2d 32 (2002).

In ascertaining the Legislature's intent, we give the words of the statute their ordinary meaning. *O'Connor v. Baltimore County,* 382 Md. 102, 113, 854 A.2d 1191 (2004); *Ridge Heating, Air Conditioning and Plumbing, Inc. v. Brennen,* 366 Md. 336, 350, 783 A.2d 691 (2001). If the statute is free of ambiguity, we generally will not look beyond the words of the statute to determine legislative intent. *Johnson,* 387 Md. at 11, 874 A.2d 439; *Kaczorowski v. Mayor of Baltimore,* 309 Md. 505, 516, 525 A.2d 628 (1987); *Chow,* 163 Md.App. at 498–99, 881 A.2d 1148. Indeed, "[i]f the plain language of the statute is unambiguous and is consistent with the statute's apparent purpose, we give effect to the statute as it is written." *Comptroller of the Treasury v. Phillips,* 384 Md. 583, 591, 865 A.2d 590 (2005).

On the other hand,

where a statute is plainly susceptible of more than one meaning and thus contains an ambiguity, courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of the enactment. In such circumstances, the court, in seeking to ascertain legislative intent, may consider the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense.

*Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 75, 517 A.2d 730 (1986) (citations omitted); *see Maryland Division of Labor and Industry v. Triangle General Contractors, Inc.,* 366 Md. 407, 425–6, 784 A.2d 534 (2001); *Chesapeake Charter, Inc. v. Anne Arundel County Bd. of Educ.,* 358 Md. 129, 135, 747 A.2d 625 (2000).

Even under the plain meaning rule, however, we do not ignore the Legislature's purpose if it is readily known. *State v. Pagano,* 341 Md. 129, 133, 669 A.2d 1339 (1996). In this regard, "we may . . . consider the particular problem or

problems the legislature was addressing, and the objectives it sought to attain." *Sinai Hosp. of Baltimore, Inc. v. Department of Employment & Training*, 309 Md. 28, 40, 522 A.2d 382 (1987); *see also Romm v. Flax*, 340 Md. 690, 693, 668 A.2d 1 (1995).

Further, we are obligated to construe the statute as a whole, so that all provisions are considered together and, to the extent possible, reconciled and harmonized. *Curran v. Price*, 334 Md. 149, 172, 638 A.2d 93 (1994); *State v. Crescent Cities Jaycees Foundation, Inc.*, 330 Md. 460, 468, 624 A.2d 955 (1993); *Heartwood 88, Inc. v. Montgomery County*, 156 Md.App. 333, 359, 846 A.2d 1096 (2004). Where "appropriate," we interpret a provision "in the context of the entire statutory scheme of which it is a part." *Gordon Family Partnership v. Gar On Jer*, 348 Md. 129, 138, 702 A.2d 753 (1997); *see Knight v. Princess Builders, Inc.*, 162 Md.App. 526, 531, 875 A.2d 771 (2005). Therefore, if a provision "is part of a general statutory scheme or system, the sections must be read together to ascertain the true intention of the Legislature." *Mazor v. State Dep't. of Correction*, 279 Md. 355, 361, 369 A.2d 82 (1977).

When "reasonably possible," we read a statute so "that no word, phrase, clause, or sentence is rendered surplusage or meaningless," *id.* at 360, 369 A.2d 82, or "superfluous or redundant." *Blondell v. Baltimore City Police Dep't*, 341 Md. 680, 691, 672 A.2d 639 (1996); *see Eng'g Mgmt. Servs. v. Md. State Highway Admin.*, 375 Md. 211, 224, 825 A.2d 966 (2003); *Mayor & Council of Rockville v. Rylyns Enters.*, 372 Md. 514, 551, 814 A.2d 469 (2002). To effectuate the Legislature's intent, we may consider " 'the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense.' " *Chesapeake Charter, Inc.*, 358 Md. at 135, 747 A.2d 625 (citation omitted); *see Johnson*, 387 Md. at 11–12, 874 A.2d 439; *Triangle General Contractors, Inc.*, 366 Md. at 425, 784 A.2d 534; *Bd. of License*

*Comm'r's v. Toye,* 354 Md. 116, 123, 729 A.2d 407 (1999); *Frost v. State,* 336 Md. 125, 137, 647 A.2d 106 (1994).

Of import here, when the Legislature fails to define a particular statutory term, we first consider the plain meaning of the term, and give that term its "ordinary and natural meaning [without] resort to subtle or forced interpretations...." *Md.-Nat'l Capital Park & Planning Comm'n v. Dep't of Assessments & Taxation,* 110 Md.App. 677, 689, 678 A.2d 602 (1996), *aff'd,* 348 Md. 2, 702 A.2d 690 (1997); *see also Johnson,* 387 Md. at 11, 874 A.2d 439; *Ridge Heating,* 366 Md. at 350, 783 A.2d 691. In deciding the plain meaning of a statutory term or phrase, we may consult the dictionary. *Department of Assessments & Taxation v. Maryland–Nat'l Capital Park & Planning Comm'n,* 348 Md. 2, 14, 702 A.2d 690 (1997); *Rossville Vending Mach. Corp. v. Comptroller of the Treasury,* 97 Md.App. 305, 316, 629 A.2d 1283, *cert. denied,* 333 Md. 201, 634 A.2d 62 (1993). If we cannot glean the Legislature's intent from "the statutory language alone," we may "look for evidence of intent from legislative history or other sources." *Allstate v. Kim,* 376 Md. 276, 290, 829 A.2d 611 (2003); *see Motor Vehicle Admin. v. Lytle,* 374 Md. 37, 57, 821 A.2d 62 (2003); *Heartwood 88,* 156 Md.App. at 359, 846 A.2d 1096.

To be sure, we "avoid construing a statute in a way which would lead to absurd results." *Blandon v. State,* 304 Md. 316, 319, 498 A.2d 1195 (1985). Nor may we read language into the statute that is not expressly stated or clearly implied, or embellish a statute to expand its meaning. *Johnson,* 387 Md. at 14, 874 A.2d 439; *Department of Econ. & Employment Dev. v. Taylor,* 108 Md.App. 250, 277–78, 671 A.2d 523 (1996), *aff'd,* 344 Md. 687, 690 A.2d 508 (1997). Put another way, courts may " 'not invade the function of the legislature' by reading missing language into a statute" to correct " 'an omission in the language of the statute even though it appeared to be the obvious result of inadvertence.' " *Graves v. State,* 364 Md. 329, 351, 772 A.2d 1225 (2001) (citation omitted). *See also Fisher and Utley v. State,* 367

Md. 218, 292, 786 A.2d 706 (2001) (Bloom, J., concurring and dissenting) (stating that courts "may not ... supply missing language when there is a *casus omissus* in the legislative scheme by judicially creating a statutory provision that the legislature would probably have added if it had given any thought to the problem it had not addressed").

### D.

 As noted, we must determine whether appellant, a police agency, has a right of judicial review in the circuit court with respect to an administrative determination under LEOBR that exonerated the police officer. P.S. § 3–108(a)(3) provides that "[a] finding of not guilty terminates the action." Although P.S. § 3–109(a) states that "[a]n appeal from a decision" made under P.S. § 3–108 "shall be taken to the circuit court," it does not identify the parties who are entitled to take such an appeal.

 In construing the LEOBR, as we are compelled to do here, we are mindful that its "primary purpose of the LEOBR is ' "to guarantee certain procedural safeguards to law enforcement officers during any investigation or interrogation that could lead to disciplinary action, demotion, or dismissal." ' " *Coleman,* 369 Md. at 122, 797 A.2d 770 (citations omitted); *see Boyle,* 385 Md. at 155, 867 A.2d 1050 (reiterating that "the purpose of LEOBR was to provide procedural safeguards for law enforcement officers during any investigation and subsequent hearing that might result in disciplinary action...."); *Marshall,* 158 Md.App. at 123–24, 854 A.2d 299 (" 'The legislative scheme of the LEOBR is simply this: any law-enforcement officer covered by the Act is entitled to its protection during any inquiry into his conduct which could lead to the imposition of a disciplinary sanction.' ") (citation omitted). Indeed, as the circuit court observed, the title of the statute itself—"The *Law Enforcement Officers'* Bill of Rights"—supports that interpretation.

 Nevertheless, a LEOBR proceeding is not the equivalent of a criminal trial. *See Coleman v. Anne Arundel*

*County,* 136 Md.App. 419, 450, 766 A.2d 169 (2001) ("Nor do we believe that a finding of 'guilty' or 'not guilty' or the imposition of 'punishment' transforms the LEOBR proceedings into a criminal or quasi-criminal trial") (citation omitted), *aff'd,* 369 Md. 108, 797 A.2d 770 (2002); *Tippery,* 112 Md.App. at 353, 685 A.2d 788 (1996); *Meyers v. Montgomery County Police Dep't.,* 96 Md.App. 668, 703, 626 A.2d 1010 (1993) (agreeing "that the LEOBR proceedings have some indicia of a criminal trial[,]" but concluding that "they are, in reality, administrative proceedings conducted by laypersons"). Therefore, we do not rely on a fundamental principle applicable to criminal cases—when a defendant is acquitted in a criminal case, double jeopardy bars the State's right to challenge the verdict by way of an appeal.

LEOBR was first enacted pursuant to House Bill ("H.B.") 354, which was approved on May 31, 1974, and became effective on July 1, 1974.[9] It proposed, in part:

> For the purpose of providing that all law enforcement officers have certain rights; ... providing a procedure for a hearing on the issues if the investigation or interrogation results in the recommendation of certain types of action against the officer; [and] providing for an appeal from a decision resulting from a hearing ...

LAWS OF MARYLAND 1974, Vol. II, Ch. 722 at 2472.

When initially enacted in 1974, Art. 27, § 731, the predecessor statute to P.S. § 3–108, did not include the language concerning the effect of a Board's finding of not guilty. In its original form, the provision was comparable to what now appears in P.S. §§ 3–108(a)(1), 3–108(a)(2), and 3–108(a)(5). It stated:

> Any decision, order or action taken as a result of the hearing shall be in writing and shall be accompanied by findings of fact. The findings shall consist of a concise statement upon each issue in the case. A copy of the

---

9. We were unable to locate any useful legislative history pertaining to H.B. 354.

decision or order and accompanying findings and conclusions, along with written recommendations for action, shall be delivered or mailed promptly to the law enforcement officer or to his attorney or representative.

LAWS OF MARYLAND 1974, Vol. II, Ch. 722 at 2461.

The LEOBR has been amended numerous times since its initial enactment. The text at issue here—"A finding of not guilty terminates the action"—was added to LEOBR by Senate Bill ("S.B.") 1026, approved on May 17, 1977, and effective on July 1, 1977. *See* LAWS OF MARYLAND 1977, Vol. I, Ch. 366 at 2136. S.B. 1026 was proposed, in part, "For the purpose of altering certain provisions . . .; [and] clarifying language. . . ." *Id.* at 2129. However, the legislative history related to S.B. 1026 does not illuminate the Legislature's intent as to the right of a police department to appeal an adverse decision under the LEOBR.[10]

When S.B. 1026 was first introduced to the Maryland Senate on February 25, 1977, it did not include the provision that a finding of not guilty terminates the action. However, it expressly conferred a right of appeal from a final order issued by the chief following a guilty finding. Initially, S.B. 1026 stated:

Any decision, order, or action taken as a result of the hearing shall be in writing and shall be accompanied by findings of fact. The findings shall consist of a concise statement upon each issue in the case. If a finding of guilt is made, the hearing board shall reconvene the hearing, receive evidence, and consider the law-enforcement officer's past job performance and other relevant information as factors before making its recommendations to the Chief. A copy of the decision or order and accompanying findings and conclusions, along with written recommendations for action, shall be delivered or mailed promptly to the law-enforce-

---

**10.** A hearing concerning S.B. 1026 was held on March 17, 1977, but we do not have a transcript of the testimony offered in connection with the bill. Nor have we located copies of any documents submitted at the hearing.

ment officer or to his attorney or representative of record and to the Chief. The person who may take action following any hearing in which there is a finding of guilt shall consider the law-enforcement officer's past job performance as a factor before he imposes any penalty.

\* \* \*

... The written recommendations are not binding upon the Chief. Within 30 days of receipt of the hearing board's recommendations, the chief shall review the findings, conclusions, and recommendations of the hearing board and then he shall issue his final order. *The Chief's final order and decision is binding and may be appealed* in accordance with this subtitle. . . .

(Emphasis added).

The "terminates the action" language was added, by handwritten notation, at the time of the second reading of S.B. 1026, on March 26, 1977. Another handwritten notation clarified that the Board's written recommendations as to punishment would not be binding on the chief. As revised, S.B. 1026 provided:

(A) Any decision, order, or action taken as a result of the hearing shall be in writing and shall be accompanied by findings of fact. The findings shall consist of a concise statement upon each issue in the case. *A finding of not guilty terminates the action.*[11] If a finding of guilt is made, the hearing board shall reconvene the hearing, receive evidence, and consider the law-enforcement officer's past job performance and other relevant information as factors before making its recommendations to the Chief. A copy of the decision or order and accompanying findings and conclusions, along with written recommendations for action, shall be delivered or mailed promptly to the law-enforcement officer or to his attorney or representative of record and to the Chief. The person who may take disciplinary

---

11. This text now appears in P.S. § 3–108(a)(3).

action following any hearing in which there is a finding of guilt shall consider the law-enforcement officer's past job performance as a factor before he imposes any penalty.

* * *

... The written recommendations *as to punishment* are not binding upon the Chief. Within 30 days of receipt of the hearing board's recommendations, the Chief shall review the findings, conclusions, and recommendations of the hearing board and then he shall issue his final order. *The Chief's final order and decision is binding and may be appealed in accordance with this subtitle ....*

(Emphasis added).

In its current iteration, the LEOBR uses the phrase "terminates the action" in the context of a finding of not guilty. The LEOBR does not provide that a terminated action is final, from which an appeal may be lodged. In the context of a finding of guilty, however, the statute speaks several times of final orders and the right of appeal.

To illustrate, the statute provides that, under P.S. § 3–108(a)(4), when the accused is found guilty, the Board must reconvene, receive evidence, and make further recommendations to the chief. Under P.S. § 3–108(d)(1)(ii), upon a finding of guilt and suggested discipline by the Board, the matter is then forwarded to the chief for review, and the chief is required to "issue a final order." P.S. § 3–108(d)(2) specifically provides that the "final order and decision of the chief" is "binding" and "then may be appealed in accordance with Section 3–109...." But, the chief's final order is issued only when *the Board renders a finding of guilt.* Nowhere does the statute authorize the chief to render a final order upon the Board's finding of not guilty.

We also look to P.S. § 3–108(c)(1). It provides for two special types of LEOBR cases in which "the decision of the hearing board as to findings of fact and any penalty is final...." These are (1) cases in which the chief is an eyewitness; and (2) cases in which a collective bargaining agreement

concerning finality of the Board's decision is at issue.[12] In such cases, the chief does not review the Board's recommendations for punishment, nor does the chief issue a final order and decision. Although the chief is bypassed, P.S. § 3–108(c)(2) nonetheless provides that the Board's final decision "then may be appealed" in accordance with P.S. § 3–109(a).

Even if we assume, without deciding, that the phrase "any penalty," as used in P.S. § 3–108(c)(1), encompasses cases in which the Board does not impose a penalty (because the Board finds the officer not guilty), P.S. § 3–108(c)(2) contains express language that confers the right of appeal to both the officer and the Commission. This demonstrates that the General Assembly was well aware of how to confer a right of appeal. Yet, such language is noticeably absent in P.S. § 3–108(a)(3).

Similarly, elsewhere in LEOBR, the General Assembly expressly granted to the police agency the right of review in the circuit court. Under P.S. § 3–107(d)(4), the chief may file a motion to compel compliance with subpoenas for testimony or evidence. This, too, underscores that the absence of comparable language in P.S. § 3–108(a)(3) was by design.

The Commission suggests that the language "terminates the action" is equivalent to the finality language that appears in the statute in the context of a guilty finding. We disagree. Because the Legislature used express language in P.S. § 3–108(d)(2) regarding the officer's right to appeal a finding of guilty, which does not appear in P.S. § 3–108(a)(3) regarding a not guilty finding, the logical construction of the statutory scheme buttresses our view that the Legislature did not intend to confer on the police department a right of appeal to the circuit court from a Board's not guilty disposition.

In each of the previously discussed provisions of the LEOBR concerning final orders, the Legislature used express language to grant the right of appeal, demonstrating that the Legislature knew how to craft a right of appeal when it saw fit to do so. We agree with Anderson that the "legislature would

---

12. This case does not fall within either category.

have framed an equally specific designation or a general statement concerning judicial review of not guilty decisions if it had intended to grant such a right to the agency." Consequently, we are satisfied that the Legislature intended to distinguish between a guilty finding that is final and thus appealable, and an acquittal that ends the matter and is not appealable.

We also find support for our view in "the ancient and sound rule of construction known as *inclusio unius est exclusio alterius*." *Price v. State,* 378 Md. 378, 389, 835 A.2d 1221 (2003); *see Gillespie v. State,* 370 Md. 219, 222, 804 A.2d 426 (2002); *Dodds v. Shamer,* 339 Md. 540, 554, 663 A.2d 1318 (1995). The General Assembly easily could have stated that a terminated action is final and appealable—language it used elsewhere on several occasions in the context of a guilty finding. By articulating the statutory requirements for determining finality only with respect to guilty decisions, and expressly authorizing the right of judicial review only as to them, the Legislature signaled its intent to preclude judicial review of a not guilty decision rendered by the Board.

In addition, we are guided by what the Court said in *Miner v. Novotny,* 304 Md. 164, 173–74, 498 A.2d 269 (1985), involving a defamation action brought by a law enforcement officer against a person who previously filed a brutality complaint against the officer:

The LEOBR was enacted by the General Assembly in 1974, and *was designed to provide a law-enforcement officer covered by the statute with substantial procedural safeguards during any inquiry into his conduct which could lead to the imposition of a disciplinary sanction....*

"The [LEOBR] looks to what is essentially a two-phase administrative process. The first phase involves an internal investigation to determine whether there is some substance to the complaint or suspicion. If it appears that there is, a recommendation for some disciplinary action is made. At that point, phase two begins—an adjudicatory hearing before a departmental hearing board to determine (1) whether

the charge itself is valid, and (2) if so, what the punishment should be. *If the board finds the officer innocent of the charge, that ends the proceeding.* If it finds him guilty, it then makes a recommendation to the chief of police as to an appropriate punishment. *The chief is bound by a determination of innocence, but not a proposed punishment in the event of a finding of guilt. As to that, his decision (rather than that of the Board) is final."*

(Emphasis added; citation omitted).

It is also salient that the provisions for judicial review under the APA, set forth in S.G. § 10–222, are not conterminous with the judicial review provisions under P.S. § 3–109. As we have seen, S.G. § 10–222(a) confers on any aggrieved party the right of judicial review in the circuit court. In contrast, P.S. § 3–109(a) merely provides that, to the extent that an appeal lies from an administrative decision under § 3–108, it "shall be taken to the circuit court. . . ." P.S. § 3–109(a) does not contain the "aggrieved party" language that appears in S.G. § 10–222(a); such terminology is not used until P.S. § 3–109(b), which authorizes an aggrieved party who loses in circuit court to then appeal to this Court. As we construe P.S. § 3–109(b), it authorizes the Commission to appeal to this Court when an officer who was previously found guilty by the Board subsequently prevails in an appeal to the circuit court.

As we noted, principles of statutory construction permit us to consult the dictionary to elucidate terms that are not defined in the statute. In looking to the dictionary, we are convinced that the Legislature carefully chose the phrase "terminates the action."

BLACK'S LAW DICTIONARY 1511 (8th Ed.2004) defines "terminate" as: "1. To put an end to; to bring to an end. 2. To end; to conclude." It defines "termination" as follows: "The act of ending something; EXTINGUISHMENT." Similarly, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1289 (11th ed.2004) defines "terminate" as "coming to an end . . . to form the conclusion of . . . to serve as an ending, limit, or boundary. . . ." Further, it defines "termination" as the "end in time

or existence: CONCLUSION...." As we see it, the Legislature used the phrase "terminates the action" to express its intention that, upon an acquittal, the administrative proceeding is concluded in its entirety; this necessarily forecloses the police agency's right to judicial review of the Board's not guilty finding.

The case of *In re Valerie H.*, 310 Md. 113, 527 A.2d 42 (1987), supports our view. There, the Court of Appeals was asked to determine whether a juvenile court order "discharging a local department of social services from further custodial responsibility over a child also serves to terminate the juvenile court's continuing jurisdiction over that child." *Id.* at 115, 527 A.2d 42.

In that case, Valerie was found to be a CINA and was committed to the Department of Social Services. *Id.* at 115, 527 A.2d 42. Eight years later, when she was returned to her mother's care, the juvenile court issued an order that rescinded the commitment and "discharged" the department from further responsibility for the care, custody, and supervision of the child. *Id.* Three years later, Valerie was again placed in foster care, and the agency petitioned the court for a recommitment order. *Id.* at 116, 527 A.2d 42. However, by then Valerie had turned eighteen and was ineligible for consideration as a CINA under a new petition. Instead, she could only receive foster care services if she were recommitted to the department under the original CINA adjudication. The juvenile master denied the department's request for a hearing to review Valerie's foster care placement on the ground that the commitment had been terminated and thus the case was closed. *Id.*

The Court looked to the dictionary definitions of "terminate" and "discharge." *Id.* at 118, 527 A.2d 42. It reasoned that the language in the order "discharging" the department from further responsibility for Valerie when she was returned to her mother did not amount to a termination of the juvenile court's jurisdiction. *Id.*

Implicit in the Court's decision was the view that, if the juvenile court had used a variation of the word "termination" in its order, then such an order would have ended the existence of the juvenile court's jurisdiction, and the court would not have been able to recommit Valerie. Because the order used the term "discharge," coupled with the presumption of a juvenile court's continuing jurisdiction, the Court held that the juvenile court's jurisdiction was not terminated. *Id.*

In the context of this case, we are satisfied that appellant fares no better under the APA; the APA does not control the issue of judicial review. We explain.

P.S. § 3–102(a) states that the LEOBR "supersedes any other law of the State . . . that conflicts" with it. In our view, it is significant that the judicial review authorized by the LEOBR is not as broad as the judicial review authorized under the APA.

As we noted earlier, P.S. § 3–109(a) does not confer a right of review on any aggrieved party. In contrast, S.G. § 10–222(a) makes clear that any aggrieved party may appeal. As we construe P.S. § 3–109(b), it confers on the party who loses in the circuit court the right of appeal to this Court. This means that, in the event that an officer found guilty then appeals to the circuit court and ultimately prevails there, § 3–109(b) would allow the police agency to pursue an appeal to this Court.

Because a grant to the Commission under the APA of a right to judicial review of an adverse trial board decision conflicts with the LEOBR, appellant cannot find safe harbor in the APA. As to the Commission's right to judicial review, the statutory silence in P.S. § 3–108(a)(3) is deafening. We hold that, under P.S. § 3–108(a)(3), the Commission is not entitled to judicial review of a not guilty finding rendered by the Board.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**